**Edwin B. MISHKIN, as Trustee for the Liquidation of the Business of Parr Securities Corp., Plaintiff,**

v.

**PEAT, MARWICK, MITCHELL & CO., Defendant.**

**No. 86 Civ. 4301 (MP).**

United States District Court, S.D. New York.

Aug. 22, 1990.

Thomas J. Moloney, Cleary, Gottlieb, Steen & Hamilton (Mitchell A. Lowenthal and Jonathan A. Willens, of counsel), New York City, for plaintiff.

Sidney Davis, Davis, Markel & Edwards (Marc J. Schiller, Cynthia Feigin, George Salter and Paula Katz, of counsel), New York City, for defendant.

## OPINION AND DECISION

MILTON POLLACK, Senior District Judge.

The claims in this case were tried to the Court at a Bench trial. Jurisdiction of the separate Counts in the complaint rests on separate grounds.

Jurisdiction of Count I of the complaint herein is posited on the ground that the plaintiff is a SIPA trustee and that Count I thereof is related to a proceeding conducted in accordance with and as though under Title 11 of the Bankruptcy Code. 28 U.S.C. § 1334(b); 15 U.S.C. § 78fff(b).

Count I of the complaint asserts a state law claim for alleged negligence of a firm of certified public accountants in their performance of a 1983 audit for Parr Securities Corporation ("Parr").

Jurisdiction of Count II is posited on a federal question.

Parr was a non-public registered broker-dealer organized in 1981 as a special purpose wholly-owned subsidiary of Kenney & Branisel, Inc. ("K & B"), a non-public company. The principal owners and key management of K & B were also the sole directors of Parr. In December, 1984, K & B sold Parr to the latter's president, Gregory F. Herbert ("Herbert") who remained its sole owner for the balance of its business existence. In May, 1985, Parr was placed in liquidation by Court order.

Defendant Peat, Marwick, Mitchell & Co. ("PMM") (now KPMG Peat Marwick) is a partnership engaged in providing professional services, including auditing services. PMM audited and reported on Parr's financial statements as of and for the year ended October 31, 1983—the only audit services at issue in this action. PMM's audit report was issued on December 30, 1983.

Plaintiff Edwin B. Mishkin ("Mishkin") was designated by Court order dated May 17, 1985, as Trustee for the Liquidation of the Business of Parr pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa, *et seq.* The Securities Investor Protection Corporation ("SIPC") is *not* a party to this case. Nor are any of the customers of Parr parties to this litigation. The audit was not performed for or requested by customers of Parr. There was no knowledge of or reliance by any customer of Parr on the audit, and the customers themselves never asserted, nor indeed do they have, any cognizable claim to assert against the auditors.

### Count I
#### *The setting for the audit*

On October 31, 1983, capital and surplus of Parr were intact if the balance sheet was accurate. In reality, both capital and surplus had been wiped out and Parr was insolvent. The books had been falsified by Gregory F. Herbert, Parr's president at the time so as to conceal substantial "off-book" transactions and frauds. The balance sheet corresponded to Parr's books. Herbert's off-the-book transactions were made in the belief that the adverse market which the transactions experienced was bound to

turn and the transactions saved thereby with no one the wiser. However, the persistent decline in the market disappointed such hopes and expectations. The house of cards collapsed in May, 1985. A confession by Herbert to the Securities & Exchange Commission ("SEC") on May 3, 1985, unearthed the truth. The trustee's two year investigation of the confession with the aid of a skilled investigative team pieced together how Herbert was able to commit and conceal his frauds.

Herbert pleaded guilty to the frauds and was sentenced to three years in prison.

### The Trustee's Claim

Briefly, plaintiff alleges: (1) that Herbert caused Parr to engage in speculative securities transactions in 1983 which resulted in approximately $3.5 million in trading losses to Parr; (2) that Herbert on behalf of Parr replenished those losses by inducing certain large institutional customers to engage unwittingly in sham repurchase transactions;[1] (3) that the funds from these sham transactions were deposited by Herbert into a secret off-book account at Chemical Bank and then utilized on behalf of Parr to pay its trading losses; (4) that Parr's 1983 financial statements were misstated as a result of the omission therefrom of Parr's trading losses; and (5) that PMM negligently failed to discover those misstatements during its audit of Parr's 1983 financial statements.[2]

Plaintiff has speculated on the basis of testimony of a former SEC accountant that, but for PMM's non-discovery of Parr's financial misstatements, Parr would have been closed down by regulatory authorities at the end of 1983.[3]

1. All of the institutions who were defrauded in 1983 were later repaid by Parr and suffered no financial losses; in effect, they unwittingly made a short term loan to Parr, and were repaid with interest.

2. PMM was replaced as Parr's auditor for the ensuing year because, according to Herbert, he was afraid PMM would discover his 1984 misdeeds.

3. Under Count I, plaintiff seeks to recover the full amount by which Parr's net worth allegedly

It is not disputed that Parr's 1983 trading losses and fraudulent transactions were successfully buried and hidden from, and remained undiscovered and unsuspected by, (i) Parr's trained internal auditing personnel, (ii) from PMM, (iii) from the auditors of the New York Stock Exchange ("NYSE"),[4] and (iv) from the SEC by means of various fraudulent devices including:

— destruction and alteration of Parr's books and records;

— collusion with third parties to obtain pre-printed blank trading statements from a futures commission merchant so that false documents could be created;

— use of a secret "Parr" entitled account at Chemical Bank through which fraudulently obtained funds could be used to cover the hidden trading; and

— failure to record the fraudulent transactions on Parr's books and records.

### The Auditors Were Not Negligent

The plaintiff has failed to sustain factually his burden of proof of negligent breach of duty on the part of the defendant. The supporting grounds for the auditing acts of defendants were substantial and were established by the evidence and circumstances.

It has been affirmatively established by testimony, which the Court credits, that under all the facts and circumstances in evidence, the defendant exercised due professional care with reasonable professional judgment, acted in good faith in performing the audit and was not guilty of any inattention to the task or of negligence therein. Reasonably sufficient work was

decreased during the one-year period following PMM's audit (the period January 1, 1984 through December 31, 1984). That decrease resulted from losses incurred through legitimate (*albeit unprofitable*) trading activities and normal business operating expenses.

4. The NYSE performed two extensive examinations of Parr's books and records—both before and after PMM's 1983 audit—and also failed to discover any of the well-concealed fraudulent activities.

done on the audit; the work was competently planned, carried out, reviewed and completed in substantial conformity with the applicable generally accepted auditing standards of the profession, the regulatory requirements and the internal standards of the defendant itself, using permissible and reasonable auditing judgment in the circumstances presented. There were no sufficient circumstances to arouse suspicion or provide notice to the auditors, actual or constructive, of the fraudulent acts and criminal designs of Herbert carried out in the name of and the hoped-for benefit of Parr. The defendant had no sufficient reason or occasion to suspect the books and records of Parr which it was auditing. The criticisms of the audit by the trustee were made from the vantage point of highly costly hindsight wisdom and an undue intolerance of permissible judgmental limits.

On the totality of the evidence, and having seen and heard the witnesses I have resolved the issues of credibility in favor of the defendant and against the plaintiff. Defendant's witnesses proved to be persons worthy of belief, with impressive and lengthy professional backgrounds of vast practical experience in auditing businesses of brokers and dealers, with ample peer recognition of their professional competence, judgment and standing in the profession. PMM's interpretations and exercise of practical judgment in conducting the audit were acknowledged by plaintiff's expert, Daniel Rosenthal, to have been made by PMM in good faith and with their honest professional belief that they were in conformity with generally accepted auditing standards and with the regulatory and PMM's in-house requirements. He conceded that staffing, supervision, planning and execution of an audit were judgment calls; that: "One auditor could disagree with another and they could both be reasonable in their view."; and further that: "Q. Now, the question of reasonable adherence to the standards, in your view, is a judgment matter? A. Yes, I think it is."

*In Greater Detail*
*Applicable Legal Considerations*
■ For negligence, as distinguished from reckless misrepresentation amounting to fraud (not here claimed), an accountant is responsible only to his client, *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), and to those members of a limited class whose reliance on the accountant's service was or at least should have been specifically foreseen. *White v. Guarente*, 43 N.Y.2d 356, 372 N.E.2d 315, 401 N.Y.S.2d 474 (1977). *See also, Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985).

PMM furnished its audit with the express caveat:

> This report is intended solely for the use of management, the National Association of Securities Dealers, the New York Stock Exchange, Inc. and the Securities and Exchange Commission, and should not be used for any other purpose.

December 9, 1983

/s/ Peat Marwick,Mitchell Co.

No claim is made in this case (certainly there was no proof) that any third-party or customer of Parr ever saw or relied on or expected to see the questioned audit.

■ Parenthetically, it may be noted in respect to the regulatory filing with the SEC that even where an auditor might incur liability under federal law to members of the public, including lenders, that does not suffice to create liability under state law. *Westpac Banking Corp. v. Deschamps*, 66 N.Y.2d 16, 484 N.E.2d 1351, 494 N.Y.S.2d 848 (1985). There is no such question raised in this case, at all events. This audit report was not a prospectus published for the use of investors ·or traders; no one relied on the audit for transactions made in the post-audit period and there is no proof that Parr relied on it to conduct its fictitious transactions or its market trading.

■ The plaintiff has created the aura in this case (while actually not claiming) that any deviation from regulatory requirements, from generally accepted accounting standards ("GAAS"), from the accounting profession's published Guidelines and even

from PMM's in-house auditing principles, is *per se* negligence. None of the accounting standards, the guidelines or the law warrant such a conclusion. Certainly, deviation from the standards or guidelines may be some evidence of negligence and deviation does cast on the auditors a trial burden of explanation. But the plaintiff's burden of proof on the whole case to establish negligence of an audit remains on the plaintiff nonetheless.

■ An auditor who undertakes to examine the books and audit the accounts of a client does not guarantee the correctness of the accounts. He does undertake to use skill and due professional care and to exercise good faith and to observe generally accepted auditing standards and professional guidelines, with the appropriate reasonable, honest judgment that a reasonably skillful and prudent auditor would use under the same or similar circumstances. He is not responsible for mere error of judgment. Reasonable adherence to the standards is a matter calling for application of experience, skill and the exercise of independent judgment. The standards concern themselves not only with the auditor's professional qualities but also provide that judgment may be exercised by him in the performance of his examination and in his report. Deviation from standards does not perforce thereof spell negligence in an audit, nor are innocent blunders culpable fault.

*Parr's Representations to PMM:*

■ Parr's management was responsible for the accuracy of Parr's financial statements and for ensuring compliance with the NYSE and SEC rules.

On December 9, 1983, Parr, in writing, over the signature of Gregory F. Herbert, its president, and Robert C. Hawk, its treasurer, confirmed Parr's representations to PMM in connection with the audit:

1. We have made available to you:
 a. All financial records and related data.

 \* \* \* \* \* \*

2. There have been no:

a. Irregularities involving any member of management or employees who have significant roles in the system of internal accounting control.

b. Irregularities involving other employees that could have a material effect on the financial statements.

 \* \* \* \* \* \*

d. Violations or possible violations of laws or regulations the effects of which should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

3. There are no: ...

b. Material liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5.

c. Material transactions that have not been properly recorded in the accounting records underlying the financial statements.

 \* \* \* \* \* \*

4. Provision, when material, has been made for:

a. Loss to be sustained in the fulfillment of, or from inability to fulfill, any purchase or sales commitments.

 \* \* \* \* \* \*

8. The following have been properly recorded or disclosed in the financial Statements:

a. Related party transactions and related amounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements, and guarantees.

b. Capital stock repurchase options or agreements or capital stock reserved for options, warrants, conversions, or other requirements.

 \* \* \* \* \* \*

d. Agreements to repurchase assets previously sold.

Plaintiff's expert witness acknowledged, as a fair statement, that:

PMM was entitled to rely on the truthfulness of management representations to the extent they didn't have evidence to the contrary ...

In fact, each of those representations was materially false and fraudulent.

Herbert was a witness called on by the plaintiff at the trial. His testimony purported to reveal his concealed misconduct, which he kept off-books, and what he hoped Parr would accomplish thereby. He testified:

I would lose money legitimately and then get involved in bogus repurchase agreements or bogus sales of bankers acceptances which didn't exist to draw money in to pay off the losses ... fictional collateral.

\* \* \* \* \* \*

Q: You were trying to make profits for Parr, weren't you?

A: Yes.

\* \* \* \* \* \*

Q: Among the hopes for your conduct in these transactions was the hope that one day the market would turn and you would be on a course where you were making money, making all the money back that you had borrowed in one form or another and pay everybody off, isn't that so?

A: Yes.

After Herbert's confessions to the SEC followed by sessions with the trustee and his representatives, which provided a detailed road map of his irregularities, there followed a two-year re-audit therefrom to trace and to establish all the accounts and transactions and records thereof.[5] Peterson & Co. (the trustee's investigators), found no transactions made for Herbert's personal benefit. The illegitimate transactions engaged in by Herbert were all made in the name of Parr.

Herbert's devious frauds revealed a "new angle" of misconduct to Rosenthal, the trustee's expert witness:

Q: It took everybody by surprise, despite the lifeboats that were created to prevent it?

A: The simple answer to your question is yes.

With a prescience born of hindsight and Herbert's detailed confessions, plaintiff's expert gave the conclusory opinion that:

I believe that while perhaps his fraud, if I can use that word, might have been discovered, I believe that in the case of this audit, had the procedures followed by the auditors been · sufficient, they would have discovered that the underlying books and records of Parr Securities in 1983 were to a great extent a work of fiction with regard to the trading activities of the company and totally unreliable.

The trustee has conceded herein that there is no evidence that any PMM auditor or Parr's internal staff or its chief financial officer, himself an experienced auditor, knew Parr to be conducting transactions in the name of Parr but not recording them on Parr's financial records. Long ago it was prophetically stated by Judge Cardozo:

No doubt the wisdom that is born after the event will engender suspicion and distrust.

*Ultramares v. Touche, supra,* 255 N.Y. at 179, 174 N.E. 441.

### The Claimed Auditing Faults

Plaintiff's expert has singled out six areas in which plaintiff claims that Peat Marwick's audit was materially lacking: 1) inadequate supervision and staffing of the Parr audit by the Peat Marwick management; · 2) inadequate time spent on the audit; 3) failure to discuss the audit with the appropriate Parr management; 4) failure to confirm the Chicago Grain account; 5) failure to perform compliance tests on Parr's internal auditing procedures, allegedly in violation of § 17(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78q(a), and the rules promulgated thereunder; and 6) failure to comport with certain federal reporting regulations by failing to report an instance of customer property discovered in Parr's account, allegedly in violation of § 15(c) of the 1934

---

5. The exercise was costly; the trustee spent about $900,000 to accomplish this re-audit

quest.

Act, 15 U.S.C. § 78o(c), and Rule 15c3–3, 12 C.F.R. § 240.15c3–3, promulgated thereunder, and § 17(a) of the 1934 Act and the rules promulgated thereunder. Each criticism will be evaluated in turn. Additional contentions in the record have also been considered and found not to merit separate attention in the overall evaluation of the sufficiency of the audit.

### a. Staffing and Supervision of the Audit

■ The following PMM personnel worked on PMM's audit of Parr's 1983 financial statements: Charles A. Hurty—originally engagement partner and, ultimately, Pre–Issuance Reviewing Partner; S. Leland Dill—engagement partner; Daniel A. McHugh—manager; William C. Handy—in-charge accountant; Gary D. McKiddy—staff accountant; John D. Weisenseel—staff accountant; Stanley J. Kryla—assistant accountant; Jeffrey Seidel—tax manager; and Barry Auerbach—tax partner. Mr. Hurty ceased to function as the engagement partner of the Parr audit in November 1983 when he underwent back surgery, at which time Mr. Dill assumed the responsibilities of engagement partner. Hurty thereafter became the Pre–Issuance Reviewing Partner on the 1983 Audit.

Mr. Rosenthal, plaintiff's expert, initially expressed an opinion that the planning and staffing process conducted by Peat Marwick for the 1983 audit was inadequate because:

> The understanding of the company, its business, its transactions, its books and records reflected the conditions that pertained at the end of 1982 rather than during 1983 ...
>
> the plan as it continued to be developed during the course of the audit was not appropriately altered to deal with the changed circumstances of the company.

(Tr. 467).[6]

The changed circumstances to which Rosenthal refers were the hiring of Herbert and his engagement in proprietary trading on behalf of Parr, especially in regard to repurchase agreements.

Rosenthal, on the basis of a deposition of a PMM staff member taken three years after the audit, complained that Stanley Kryla, the audit assistant, was engaged in only his first or second audit, a fact which Rosenthal considered significant to Kryla's ability to understand the "repo" transactions and regulatory scheme involved in a broker-dealer audit. (Tr. 560–571). Rosenthal conceded, however, that he could instruct an ordinarily intelligent person to understand what a "repo" is and how it works "in an hour or less, sufficient to execute procedures with regard to repurchase transactions." (Tr. 572). There certainly was no evidence to indicate that Kryla had received less than such instruction. Indeed, as McHugh, the audit manager, stated, there is nothing especially complex about a repurchase agreement, or a reverse repurchase agreement:

> a repo to me is, in effect, a collateralized lending type arrangement. I give you stock, you give me money, when at the same time—and then, when we're finished, we trade them back again and pay interest on the money.

(Tr. 896).

McHugh, unquestionably a seasoned accountant, rejected Rosenthal's criticism by stating that in his judgment, the staff was sufficiently experienced. (Tr. 886). McHugh noted that Kryla, sufficiently experienced himself, was not the only Peat Marwick employee engaged on the Parr audit. William Handy served as the in-charge accountant. While he had "minimal or no experience in connection with examinations of broker-dealers," he was "a second year senior in the firm, and correspondingly he was one year more advanced in his auditing career than the person ... in charge in the prior year who did have some moderate to low level of broker-dealer experience...." (Tr. 886). In McHugh's judgment Kryla was a "more senior auditor assigned to the engagement" than the auditor of the previous year, to whom neither Parr nor Kenney & Branisel objected. John Weisenseel also was a staff accountant on the 1983 audit;

---

**6.** Figures in parentheses preceded by "Tr." are references to pages of the trial record.

he had served on the 1982 audit and for the 1983 audit he was brought "in during the early start-up phase so that this staff in the field could gain off his experience." (Tr. 887).

McHugh also felt that the audit staff was sufficiently experienced and knowledgeable to understand proprietary trading, as evidenced by the following lengthy colloquy between McHugh and the Court:

> The Court: Well, is the experience level of those who were handling the audit sufficient to understand proprietary trading and its audit incidence?
>
> The Witness: I think they were, your Honor, because—well, for two reasons: My recollection is that Bill Handy, in addition to being a second-year senior, had some experience with investment portfolio work at some of his other clients. While that's not specifically broker-dealer related, a securities transaction is probably much like any other transaction. It is a purchase and sale of something with an opportunity to make a profit by selling at a higher price, et cetera.
>
> So I think, while I don't remember anything specific I wrote, I think the staff had adequate knowledge from their general audit experience to carry out processes we were doing.
>
> The Court: In other words, proprietary trading didn't pose any specialized background, training or experience other than what you would get in a normal commercial transaction.
>
> The Witness: I think there are jargon differences and things like different words that are used in the securities industry for specific transactions, but proprietary trading simply means trading on behalf of the firm as the proprietor trading.
>
> Other than the explanation of that terminology, that's simply what one is doing: Buying and selling securities.
>
> The Court: Wasn't that a new venture that was different from the 1982 audit?
>
> The Witness: In connection with Parr Securities, it was a new type of instrument which they were trading. They had been involved, I believe, from having reviewed the 1982 work papers over the last few days, with some municipal securities trading in the prior year.... So, yes, it was a new venture in the fact that it was government securities trading they were doing and the futures trading they were doing, but they had been doing some trading activities.

(Tr. 893–894).

The evidence at trial indicated that both McHugh and Dill reviewed nearly every work paper of the Peat Marwick team and put their respective tick marks, or indications of their review, thereon. Beyond mere review, McHugh testified that he performed on-site supervision of the auditor's field work (Tr. 888) and that he was always available to the staff auditors to answer questions. (Tr. 890).

Having read McHugh's trial testimony, Rosenthal pulled back from his earlier opinion as to the supervision by Peat Marwick's management:

> Q. Well, did you disbelieve his testimony?
>
> A. No.

(Tr. 1291–1292).

 \* \* \* \* \* \*

> A. The evidence of [McHugh's] review of the audit is all over the work papers, yes.
>
> Q. Isn't it also true that many of the work papers were created by McHugh?
>
> A. A number of them were created by McHugh, yes.

(Tr. 699).

Further, Rosenthal conceded, when pressed about his own failure to detect significant errors in the Peterson Group's "reconstruction" calculations, that the failure to detect such errors does not represent a *per se* failure to exercise due care in the supervision of a staff, nor is it necessarily negligence:

> Q. So you can supervise people with due care and yet not find errors, is that true?

A. Yes, it is.

Q. That's true in all of the financial statements as well?

A. Yes, it is.

Q. Is it possible for Mr. McHugh to have used due care in supervising the audit team [during] the 1983 audit, but failed to find some errors?

A. In a general sense, yes.

(Tr. 770).

Most importantly, however, Rosenthal conceded that the amount of supervision and planning of an audit require the application of an auditor's judgment; professional judgment. (Tr. 1315). As stated in the American Institute of Certified Public Accountants ("AICPA") manual, Section 1110, "The nature and extent of supervision and review must necessarily reflect wide variances in practice."

There is no credible evidence that any members of the PMM audit team had inadequate technical training or proficiency for the respective responsibilities they were assigned to perform on the Parr audit. The partners and the manager had extensive experience in the auditing of brokers-dealers and both partners served on the AICPA Committee on Stockbrokerage Auditing and participated in the drafting of the Committee's Guide entitled "Audits of Brokers and Dealers in Securities."

b. Time Spent

■ According to Rosenthal, "[b]ased on my experience, an audit of an entity such as Parr Securities was in 1983 would require on the order of 200 to 250 hours to perform adequately." (Tr. 527). Rosenthal then concluded that spending half that amount, 100 to 125 hours, would be "simply inadequate to deal with Parr Securities as it existed in 1983." (Tr. 528). (Rosenthal, of course, was speaking of Parr as reconstructed by the two-year Peterson reaudit.) Based on this opinion, plaintiff proffered evidence, in the form of Peat Marwick billing figures on the 1983 Parr

audit displayed on a colorful demonstration chart, to show that Peat Marwick had only billed some 77 hours on the Parr engagement.

According to Dill and McHugh, however, the time Peat Marwick billed on the Parr engagement is deceptively low and does not reflect the actual time apparently spent. The Parr audit occurred simultaneously with the audits of Kenney & Branisel, the parent company, and its related entities. As Rosenthal agreed, Parr was merely an incorporated department of Kenney & Branisel, (Tr. 635), or, as McHugh stated, a special purpose subsidiary. (Tr. 863). The evidence indicates that time actually spent on Parr's books was sometimes attributed for billing purposes to Kenney & Branisel or the other subsidiary entities.[7] Alternatively, McHugh testified that often time spent was not billed. (Tr. 913). For example, plaintiff's chart indicates that McHugh spent only some eight hours on the Parr engagement. However, he testified that to the best of his recollection he spent more than that. (Id.). Plaintiff's chart indicated that Dill spent zero hours on the Parr audit; yet his testimony, supported by his accounting tick marks physically placed and found on the work papers, make clear that the time records were not accurate at least to that extent. As Rosenthal agreed, there is no standard that requires an auditor to keep a record of time spent on an audit. (Tr. 711). In short, the credible evidence was that sufficient time was supplied for the audit.

c. Contact with Appropriate Parr Management

■ A further flaw in the 1983 audit assigned by Rosenthal was that Peat Marwick did not gather "sufficient and adequate evidence to support the financial statements and assertions made by management in those financial statements." (Tr. 468). In particular, Rosenthal faulted Peat Marwick for not having had substantial contact with Herbert:

7. Indeed, ¶ 38 of the complaint in this action states: "time spent on each audit became impossible to separate."

Mr. Herbert was, in addition to being the president, the individual involved in the trading activities of the company as well as a significant player in the process of developing the company's financial statements and books and records in that he maintained the trading records and prepared the reconciliation of those records that went into the monthly journals.

I believe that those three roles suggest that he is an individual that the auditors should have had significant contact with.

(Tr. 497–498).

McHugh explained that he saw Parr as just a special purpose subsidiary of K & B, the holding company, and that the people truly responsible for Parr in 1983 were Kenney, Branisel and Regan:

A. ... As regards the management of the company, John Regan, Bill Kenney, I believe it was Ray Branisel were the senior managers who ran the firm.

Kenney [and] Branisel, to the best of my knowledge, focused more on the business trading sides and John Regan, although he focused on that side as well, also focused on the administrative and operational side of the firm. For him worked Chuck Hawk, and Chuck was the—I don't remember his formal title, but he was the equivalent to the chief financial officer or chief accounting officer of the group and was responsible for all the accounting operations within the group.

(Tr. 846). As for Herbert, McHugh stated:

A. He had the title president of Parr, and Herbert, my understanding and my recollection of it was that he was responsible for the trading activity that was taking place in Parr and that he was being supervised, if you will, by the Kenney, Branisel and Regan team as regards trading activity and trading decisions, and then Chuck [Hawk] was responsible for the accounting operations and financial reporting.

(Tr. 846–847). Because he considered Hawk the chief financial officer of Parr as well as K & B and did not believe that Herbert could have fired Hawk if he had

wanted to (Tr. 847), McHugh testified that he, along with Charles Hurty, the original engagement partner, visited the premises of K & B and Parr and met with Regan and Hawk. (Id.). He testified further that he believed those discussions concerned "client operations, what the business is, what activities were taking place and possibly the fee." (Tr. 849).

The deposition transcript of Hawk supports both the fact of appropriate contact with Parr management and its basic content:

Q. Do you recall having any meetings in the fall of 1983 with anyone from Peat Marwick regarding either the audits of Parr or Kenney & Branisel?

A. I don't remember when but there were planning meetings, you know, it was an audit engagement of our firm and of course we had meetings, all levels of Peat Marwick.

Q. Did these meetings also address the audit of Parr as well as Kenney & Branisel?

A. It sure did.

(Hawk Dep. 100).

Q. During these meetings, did you discuss Parr's operations?

A. Yes.

Q. Did you feel that you adequately conveyed to Peat Marwick Parr's operations?

A. At planning meetings or during the course of the audit, yes.

(Hawk Dep. 104).

On cross examination, Rosenthal was confronted with the evidence of these discussions:

Q. Do you remember Mr. Hawk's testimony that he had many discussions on many subjects with Mr. McHugh during the audit with respect to both the Kenney & Branisel audit and the Parr audit?

A. I certainly remember that Mr. Hawk stated that he had many discussions with Mr. McHugh. My *recollection* is that the substance of those discussions was reported as having been

with regard to Kenney & Branisel rather than Parr.

(Tr. 700).

#### d. Confirmation of Chicago Grain Account

 The parties stipulated on June 6, 1990, that "[a]s of October 31, 1983, Parr's Chicago Grain account had a zero balance." (PTO ¶ 18). This comports with the trial balance "PBC" (prepared by client) in the audit workpapers. (Ex. 3, Tab 17).

Inconsistently, the re-audit evidence indicates that Parr had suffered approximately a $2 million loss in its Chicago Grain account late in October 1983.

Herbert testified that he had received blank Chicago Grain statements in early November, 1983, and that he had attempted to forge such third-party statements; he claimed, however, that he was unable to do so. In any event it is undeniably clear that Herbert had intercepted the genuine October 1983 statement, and had secreted it until he turned it over to the SEC on May 3, 1985, as part of his confession.

According to Rosenthal:

Had [Parr] sent a positive confirmation to Chicago Grain of the type that they sent to A.G. Becker and Security Pacific and received back a confirmation of the statement, they would have seen on that statement that the company had a $2 million loss in the month of October, that that $2 million loss was not reflected in the books of account or in the financial statements and that those books and records and financial statements were significantly misstated.

(Tr. 584). Rosenthal reached this conclusion after looking at a statement unearthed and obtained in 1985 which was represented to be an accurate Chicago Grain statement for October 1983.

McHugh testified that it was appropriate under auditing standards to accept a zero balance as shown on Parr's trial balance ("PBC") without further confirmation. (Tr. 904). He stated:

I think that there is no requirement in the professional standards that you send a confirmation on any particular balance. In the course of audit examinations which I've dealt with, we have—we select samples of receivables to confirm. We confirm all receivables. We make mistakes. We don't necessarily send out all the confirmations we thought, and then we do alternative procedures or try to do alternative procedures by looking at statements or activities or what have you. So we do—I've seen things done in a myriad of ways over the course of my career.

(Tr. 904–905).

Rosenthal admitted:

Q. Generally accepted auditing standards do not require specifically, do they, that auditors confirm all receivables balances?

A. No, they do not.

\* \* \* \* \* \*

Q. Nor do—well, it's a matter of judgment whether to confirm balances or not, is that a fair statement?

A. Yes. It's a matter of judgment specific to the circumstances of the audit and the degree to which the auditor has other evidence or has done tests of the accounting system and so forth, yes.

(Tr. 825).[8]

#### e. Reliance on Internal Controls and Compliance Tests

 Peat Marwick's opinion letter stated:

As part of our examination, we made a study and evaluation of the Company's system of internal accounting control to the extent we considered necessary to evaluate the system as required by generally accepted auditing standards and Rule 17a–5 under the Securities Exchange Act of 1934. This study and

---

**8.** *See also* Gleick, *The Census: Why We Can't Count, The New York Times Magazine,* July 15, 1990, at 23, cols. 1–2 ("Accounting firms ... rely on sampling too.... 'If you take a random sample, and every transaction is clean, then the laws of probability tell you the whole thing is clean.'").

evaluation included the accounting system, the procedures followed by the Company in making periodic computations of aggregate indebtedness and net capital under Rule 17a–3(a)(11) and the procedures for determining compliance with the exemptive provisions of Rule 15c3–3.... Our study was more limited than would be necessary to express an opinion on the system of internal accounting control taken as a whole.

(Plf. Ex. 14).

Rosenthal criticized Peat Marwick's judgment that it was unnecessary to perform compliance testing of Parr's internal controls. Rosenthal believed that if Peat Marwick had done so properly it would have discovered Herbert's falsification of the so-called blotter which he created and thereby his frauds:

Q. And what obligation, if any, does an accounting firm auditing a broker-dealer have to learn whether such books of original entry, such as the blotter you refer to, are, in fact, being kept?

A. Well, the books I just described are important in the audit of a brokerage concern for two reasons:

First because the accountant is reporting on them in his letter on internal accounting control and, second, because they are critical elements of the company's accounting system and its system of controls and of checks and balances.

An auditor has to perform a study and reach an understanding about the system itself, the structure of the system, the way it works, the controls in place in order to design his audit and execute the audit procedures.

\* \* \* \* \* \*

Q. And do professional standards provide the auditor to take a further steps and create tests to determine whether or not these original records in fact reflect the transactions which the broker-dealer is counting in? [sic]

A. Yes, they do....

An auditor may choose to perform detailed tests of specific controls in the accounting system, of transactions as they flow through the accounting system in order to develop a level of reliance on that accounting system for use in subsequent work, or he could choose to follow a slightly different route and perform less detailed and substantive procedures.

However, at a minimum, I believe he should perform procedures designed to determine that that system exists as documented as he understands it and is functioning.

(Tr. 462–464).

Q. What is your opinion as to whether Peat, Marwick needed to do substantive testing or compliance testing of those records in order to perform an audit in conformity with GAAS and the requirements of 17c–5?

A. I believe that in order to reach the audit objectives in their working papers and audit planning in conformity with GAAS and 17c–5, they should have performed some testing of those systems.

Q. Is there any indication in the work papers that they did that work?

A. No, there isn't.

(Tr. 1361). This was one of the primary nubs of Rosenthal's opinion that Peat Marwick had not exercised professional due care in the 1983 audit, (Tr. 799), and that Peat Marwick's opinion letter should not have been issued without a review of the internal controls. (Id.).

McHugh stated that he performed the work on the regulatory compliance in the 1983 Parr audit, which was later reviewed by Dill. (Tr. 869). McHugh explained that Peat Marwick had performed a substantive balance sheet audit[9] of Parr and explained

9. McHugh described what a substantive balance sheet audit is:

The approach which we would take in connection with a substantive balance sheet audit was to identify clients' indicated balances in the balance sheet, then set about either selecting through samples or individual accounts or in some other fashion approaching the balance sheet such that we could [gain] satisfaction of all the assets and liabilities.

why Peat Marwick had not relied on Parr's internal controls in performing such an audit:

> ... The reason that for particularly smaller securities industry clients we would place no reliance on internal control was because of the fact that they had a small, small group with heavily involved management and there was a significant possibility of management override ...

(Tr. 871). The Court sought clarification of this point:

> The Court: The point is no matter what their internal controls were, if they were small enough, you would not place reliance on it because it wasn't sufficiently objective for your purposes?
>
> The Witness: That is correct.

(Tr. 872). McHugh admitted that Peat Marwick had not literally complied with its own audit manual by not testing the internal controls of Parr and not testing the so-called boundary controls. (Tr. 1020–1021). He stated, however, that

> these manuals that we're looking at are to provide guidance to the auditor in connection with the manner in which the auditor approaches the examination they are conducting. And in each of those examinations, the auditor is using their professional judgment, their experience, the experience of the people who have trained them in developing the procedures and the approach which they've taken, and that I think is important to realize.

(Tr. 1021).

Dill, who helped develop and produce the industry audit guide, testified that the audit guide did not *require* public accountants to conduct compliance tests of internal controls, either in general or specifically in regard to the Parr 1983 audit. (Tr. 1106). Furthermore, he quoted from the guide itself to the effect that: " 'This publication is only a guide in determining the scope of

the work for each individual audit, it is not intended to limit or to supplant individual judgment, initiative, imagination and vigilance.' " (Tr. 1105). When asked, "Did you believe at the time conducting a substantive balance sheet audit with no reliance on internal controls could meet the objectives of Rule 17 generally?", Dill responded, "Yes, I did, and I do." (Tr. 1112). He then explained his basis for this opinion:

> Well, a substantive balance sheet audit looks at all of the major components in the balance sheet and requires or tries to achieve virtually a hundred percent test verification of the accounts in the balance sheet. In doing that, you have an opportunity to prove these balances and thereby make a judgment on the effectiveness of the internal accounting control of the enterprise.
>
> For example, the bank accounts, confirm the bank balances with the bank, review the bank reconciliations, the reconciliations prepared by the client. Do they agree with the records of the company? Yes they do. The controls with respect to these accounts appear to be functioning.
>
> The accounts receivable, does the trial balance agree with the subsidiary ledger? Is it in balance? Are the confirmations that are received back indicative that these accounts are correct?
>
> Yes, they are. There's an indication that the internal controls regarding the accounts receivables section are functioning.
>
> You can go down the balance sheet, including inventories, accounts payable, and are all of these accounts fairly stated, yes, they are. Can you conclude that the controls, the internal accounting controls that produce the information for these accounts are functioning? I think you can, yes.

(Tr. 1112–1113).

On cross examination, Rosenthal made the following concessions regarding Peat

---

Having gained satisfaction of the assets and liabilities as of the end of the year, we would know that we had, in effect, implicit proof that the transactions which had built up those

assets and liability balances at the end of the year were correct.
(Tr. 873).

Marwick's treatment of Parr's internal accounting controls:

Q. Isn't it also true that in 1983, the substantive balance sheet approach, if executed properly, was an appropriate approach in auditing a nonclearing broker-dealer like Parr?

A. Yes.

Q. So at least to the extent that Mr. McHugh and Mr. Dill had determined in the plan to do a substantive balance sheet audit, they were using professional due care to that extent?

\* \* \* \* \* \*

A. [After clarification by the Court that the questioner was asking about the planning stage:] To the extent that they had a plan to do a substantive balance sheet audit and had identified all of the appropriate components of such a plan, that would have been exercising due care.

(Tr. 797–798).

Q. ... Is it appropriate under generally accepted auditing standards to do a substantive balance sheet audit without reliance on internal controls, putting aside for the moment whether or not you are also going to write this letter to the regulators about the internal controls, just generally, can you do a GAAS audit that way?

A. Yes, you can.

Q. So at least to the extent that Mr. McHugh and Mr. Dill were trying to do a GAAS audit and were planning to do a GAAS audit, at least to that extent they were using professional due care at this point in the plan?

A. To that extent, yes.

(Tr. 799).

Further, Rosenthal conceded the following in regard to whether the trial balances and the balance sheet matched:

Q. And if the trial balances in the end are deemed by the auditors, after the application of all of their tests, to be reliable, isn't it fair to say that a reasonable auditor can conclude that apparently the internal controls over the accounting information that gets into the trial balance are reliable?

A. If you've done enough work, yes. (Tr. 813).

The extent to which inquiry must be pressed beyond appearances is a question of judgment, as to which opinions will often differ. *Ultramares v. Touche, supra,* at 179, 174 N.E. 441.

Rosenthal conceded also that "the trial balance [audited by Peat Marwick] agrees to the underlying books, at least to the general ledger" at least in regard to the on-book transactions, *i.e.,* those not concealed by Herbert. (Tr. 814).

Finally, Rosenthal conceded that:

The Court: There is always a residual judgment factor in the application of GAAS, isn't there?

The Witness: Yes, there is.

The Court: And that is true also in connection with Regulation [Rule] 17?

The Witness: Yes, that is true.

(Tr. 1314).

f. Compliance with Rule 15c3–3

██ Rule 15c3–3 is the rule that the Securities and Exchange Commission uses for protection of the assets of the customers of brokers and dealers. It requires the broker-dealer to safeguard the customers' assets, to perform counts of any assets under their control and to maintain sufficient reserves in bank accounts specifically designated for the purpose to cover any amounts owing by the broker-dealer to their customers.

The requirement is that if the accountant has found conditions which he believes indicate a material inadequacy as defined in the regulations and reports such an inadequacy, then his letter on internal accounting control is to be filed with the balance sheet. In the event he has not determined that there is a material inadequacy, this letter is not filed with the balance sheet.

Rule 15c3–3(k)(2) provides:

The provisions of this section shall not be applicable to a broker or dealer: ...

(ii) Who, as an introducing broker or dealer, clears all transactions with and

for customers on a fully disclosed basis with a clearing broker or dealer, and who promptly transmits all customer funds and securities to the clearing broker or dealer which carries all of the accounts of such customers and maintains and preserves such books and records pertaining thereto pursuant to the requirements of §§ 240.17a–3 and 240.17a–4 of this chapter, as are customarily made and kept by a clearing broker or dealer. 12 C.F.R. § 240.15c3–3k(2)(ii) (1983). This exemption was referred to in the trial testimony as the "K2B" exemption.

Rosenthal testified that Peat Marwick was "in possession of information contained in their working papers that at the very least strongly suggests that the company had been at the end—was at the end of the [fiscal] year in violation of its exemption under Section K2B of Section 15c3–3, and in addition had been at numerous points in time throughout 1983 in violation of that exemption." (Tr. 468). The defendants questioned whether customer property was involved in the alleged illustrations except that on one occasion, on October 28, 1983, Parr was carrying customer property in Parr's Security Pacific account, which would be a violation of Parr's so-called K2B exemption.

Nelson Kibler, plaintiff's expert on Rule 15c3–3 and a former staff accountant at the SEC who participated in the development of that rule, testified regarding the customer property in the Security Pacific account on October 28, 1983:

Q. Is this, in your opinion, a technical violation?

A. No, it's a fundamental violation of the rule to claim an exemption and then expose customer funds and securities to this type of activity without benefit of complying with the rule.

(Tr. 1503). According to Kibler, when Peat Marwick discovered this violation, as the workpapers indicated, they were under an unremitting obligation to inform the company and, if it failed to take immediate action, the SEC:

A. If there was a violation of the rule, 17a–11 requires that the auditor notify the firm. The firm then would have an obligation to notify the SEC under that rule, and if the firm did not, the auditor then has an obligation to notify the commission.

Q. Isn't this just a matter of judgment, whether the auditor notifies the commission or not?

A. I don't believe so, sir. The rule is very clear, very specific, that the scope of the audit should be sufficient to be able to determine whether he was complying with the exemption as of the audit date.

(Tr. 1520). In Kibler's opinion, if this information had been revealed to the SEC, the SEC would have descended upon Parr and "whoever [was] responsible would have been severely sanctioned and could have been barred." (Tr. 1528).

Dill testified that he was aware of the alleged violation of Rule 15c3–3, but that in the instant situation in his judgment there was no unremitting obligation to declare Parr in violation of the rule:

Q. At the time you and Mr. McHugh talked about this and reviewed the situation, did you believe that Parr had committed a violation of its exemption that required you to report to the— that was required to be reported to the SEC?

A. No.

Q. Why not?

A. Well, it appeared to us, I think, after I discussed this with Mr. McHugh, that this was inadvertent. And, more than that, as a result of the discussion I had with Mr. McHugh—I believe his memo reflects it—the security [in question] was delivered out on November 1, which was a date immediately following our audit date, and it had been delivered before we discovered it wasn't delivered. So it indicated to me that the company was trying to comply with their exemption, even though there may have been a momentary lapse.

(Tr. 1156–1157). The following colloquy further reveals Dill's reasons for not in-

forming the SEC of this "momentary lapse":

Q. It wasn't up to you, was it Mr. Dill, to decide whether or not a violation was inadvertent or an inconsequential lapse? That wasn't your job as an accountant, was it?

A. I think the accountant and auditor is allowed judgment in these matters when it is his signature on the letter, yes.

Q. So your testimony is that you were in a position once you had discovered a violation of the rule to decide it was inconsequential and not report it?

A. There are other factors that relate to the conditions of the exemption.... The situation that you are referring to we concluded to be inadvertent and not a violation of the conditions of exemption.

The Court: Does that mean that in your opinion there is a permissible area of tolerance?

The Witness: Well, in my experience in the securities business, your Honor, there are violations that are endemic on the face of it where there is—it comes to the auditor's attention where either through ignorance of the rule or through just a blatant disregard of the rule, and those are conditions at which the rule, I would consider the rule to be violated.

An inadvertent—

The Court: That is an exercise of judgment during the audit?

The Witness: Yes, sir. Yes, sir.

The Court: And in your background and experience, you believe that regardless of what the rule is, that in the practical affairs of the world, you are entitled to take cognizance of that kind of a situation and exercise judgment.

The Witness: That's correct, your Honor.

The Court: So that the standards that we have been talking about have built in them a tolerance of judgment and oversight of what could be deemed to be error?

The Witness: I believe even the experts at the Securities and Exchange Com-mission would agree with that, your Honor.

(Tr. 1232–1233).

Rosenthal agreed at least somewhat with Dill's assessment:

The Court: There is always a residual judgment factor in the application of GAAS, isn't there?

The Witness: Yes, that's true.

The Court: And in the application of 15c3–3 ...?

The Witness: There can be judgment in that case as well depending on the circumstances, somewhat less?

(Tr. 1314).

*Michael Passarella*

The defendants presented testimony of a highly experienced, recognized auditing authority, who had independently reviewed the entire audit procedure and considered the Rosenthal criticisms. This witness, Michael Passarella, was unequivocally of the opinion that none of the criticisms, when the facts were fully considered in context, warranted a conclusion that PMM had failed to comply with generally accepted auditing standards. His opinion was that PMM's audit evidenced due professional care, evidenced the exercise of reasonable, acceptable professional judgment and was conducted in accordance with GAAS and that the two reports issued by PMM as a result of the examination were appropriate under the circumstances.

Mr. Passarella, a CPA and 15 year partner at Price Waterhouse, has 27 years experience in the field; he has served as engagement partner in approximately 100 broker-dealer audits and as preissuance partner in about the same number of audits. For 10 years, he has been the national director of Price Waterhouse's securities industry practice. He served as chairman and as a member of the AICPA Committee on Stock Brokerage and Investment Banking; he was a member of an AICPA task force on "Using the Work of the Specialist" and of the AICPA task force on the audit of Repurchase Agreements; he is a member of the Financial Management Division and Internal Audit Division of the Securi-

ties Industry Association, the National Association of Securities Dealers Operations Committee, and the New York State Society of CPA's Committees on Stock Brokerage Accounting and Commodities Accounting. Passarella participated in drafting Accounting and Auditing guides issued by the AICPA Stock Brokerage Committee and testified that these guides are not meant to supplant the judgment of the auditor.

Passarella refuted Rosenthal's conclusions that PMM did not conduct a proper audit of Parr by the following:

1. Passarella found clear evidence that there was a planning exercise performed by PMM, including a visit by Hurty to Parr's financial principals.

2. Passarella expressed the opinion that there was adequate supervision of the audit; that the record demonstrates that McHugh's review was all over the work papers and that McHugh and Handy's testimony corroborated this conclusion.

3. Passarella testified that the PMM engagement team decided not to rely on the internal controls of Parr and that this was perfectly consistent with GAAS. He testified that if PMM intended to place no reliance on the internal controls, then it was unnecessary to review these controls. In addition, there were areas of the internal controls that were reviewed and tested as part of the audit.

4. Passarella countered Rosenthal's claim of insufficient fieldwork by pointing out that PMM's standard of field work, as measured against GAAS, was sufficient in terms of evidentiary matter affording the basis for their opinion regarding the financial statements.

5. Passarella testified that the 15c3–3 question was not a fundamental violation of the SEC rule that should have been reported to management or the SEC because PMM, in the exercise of a reasonable judgment of the infraction, was not required to disclose in its material inadequacy letter that the transaction may have violated the exemption. Passarella was of the opinion that the exercise of PMM's judgment was appropriate and within judgment that could be exercised in assessing

this matter; it was an inadvertent slip that was corrected in a few days by the system and not as a result of auditor intervention and thus, the judgment of the engagement team that this was not a systemic problem was reasonable.

6. In an effort to cut short further consideration of the question raised by Rosenthal whether PMM had supplied sufficient time to the audit, he was asked directly and shortly by the Court whether, in his opinion, PMM had spent sufficient time on the audit and he responded directly: "Yes, sir, I do."

7. Passarella pointed out that GAAS did not require PMM to confirm the Chicago Grain account; that Parr's records of that account showed a zero balance; that it was not obligatory under PMM's audit plan to confirm the Chicago Grain account; and that this was a commodities firm and the 100% confirmation in PMM's work papers related to securities.

On some additional criticisms, Passarella did not see any breach of the standards if in fact Kryla used the Security Pacific reconciliation in carrying out his test work. (There was no evidence one way or the other.) Further, he was of the opinion that the primary obligation for the development and maintenance of an adequate internal control system belonged on the management of Parr; and that the auditors are not originators of the records. However, were the auditors to have found anything wrong with the management's records, which they did not in this case, the procedure would have been to make recommendations to modify the books of account. He found substantial evidence that the judgment exercised in this case was reasonable and in good faith and that PMM went far enough in its job.

### Conclusion on Count I

Exposing latent misconduct by an accounting audit, *after* the clues have been confessed and handed to critics, like solving a crossword puzzle after the answer has been published, does not warrant a finding that there was malpractice where there is

convincing evidence of due professional care within the limits of permissible exercise of professional judgment, despite the failure to sense fraud (or in the case of the puzzle to sense the answers to the word puzzle).

I am firmly convinced on all the facts and circumstances in evidence there was no culpable negligence in this audit and it would be unreasonable to assume or find that Herbert's frauds should have been discovered by an audit under the circumstances of this case.

### Count II

Count II of the complaint was brought by the trustee on behalf of and for the personal benefit of five financial institutions, three banks and two federal savings and loan associations, who engaged in purported purchases and sales of alleged securities transactions with Parr in mid-to-late 1984, long after PMM's audit engagement had ended.

Count II, framed under the federal securities laws, was dismissed before trial on a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., aided by a hearing under Rule 43(e) which indicated that the requisite showing of available evidence to sustain a federal claim was lacking. The charge was aiding and abetting Parr's frauds in the sale of the purported securities in 1984 by a reckless audit of Parr in 1983. 15 U.S.C. § 78j(b); 17 C.F.R. 240.-10b–5.

The alleged purchase and sale transactions which form the basis for the claims in Count II never actually took place but were negotiated by Herbert in June, November and December of 1984. The trustee alleged that Parr sold "participations" in non-existent banker's acceptances with maturities of less than nine months to two of the banks and to the two savings and loan associations, and sold a non-existent treasury note with a thirty year maturity to the third bank. It was not disputed that defendant had no knowledge of the fraud and had not learned information subsequent to the release of its audit report which would have triggered a duty to disclose that the audit report was inadequate.

There was no specific probative evidence proffered by the plaintiff in the defense to summary judgment to support a claim of intent by PMM to aid and abet Herbert or of conscious disregard of any duty by PMM to sustain a charge of reckless conduct by them. The most that plaintiff was able to show in a supposed melange of auditing faults was alleged negligence in the audit that could not sustain a federal claim on the grounds of knowing or reckless conduct.

In addition, the claims of two of the banks and of the two savings and loans are not cognizable under the Securities Exchange Act because the allegedly fraudulent transactions did not involve a "security," as defined in the Act; involved were transactions exempt from the anti-fraud sections of that Act.

Moreover, Mishkin, as a SIPA trustee, had no statutory authority to bring suit on behalf of the three banks because SIPA does not provide for compensation of claims of banks nor does it allow the assignment of choses in action by the banks to a SIPC trustee.

█ Although it is unnecessary to reach and wrestle with the trustee's standing to sue on any of these claims, a SIPC trustee to liquidate an insolvent broker's estate lacks legal status to sue in the personal interest and on behalf of customers of a debtor in liquidation against third parties for violations of Rule 10b–5.

The order of dismissal of Count II stated opinion would follow.

### Aiding and Abetting Liability

█ The oft-stated requirements for aiding and abetting a Rule 10b–5 violation are:

(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;

(2) "knowledge" of this violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*IIT v. Cornfeld*, 619 F.2d 909, 913 (2d Cir. 1980); *see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–48 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

▮ Here, there is no doubt that a primary violation by Herbert occurred.

The second step of the aiding and abetting test, knowledge, is less clear. The courts have not settled on one definition of "knowledge" for purposes of aiding and abetting liability.

▮ Plaintiff urged the court to find knowledge through PMM's alleged recklessness. The "recklessness" standard has been used when a fiduciary duty exists between the plaintiff and the defendant. *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d at 46–47 (2d Cir.1978). But where no fiduciary duty exists, this circuit has stated that recklessly failing to discover a fraud does not meet the scienter requirement.

> [Recklessly failing to discover fraud does not reach] the status of an aider and abettor.... Finding a person liable for aiding and abetting a violation of 10b–5, as distinct from committing the violation as a principle, requires something closer to an actual intent to aid in a fraud, at least in the absence of some special relationship with the plaintiff that is fiduciary in nature.

*Edwards & Hanly*, 602 F.2d at 484, 485; *see also IIT v. Cornfeld*, 619 F.2d at 925 (quoting *Woodward v. Metro Bank*, 522 F.2d 84, 97 (5th Cir.1975)). In other words, there is a scale of the degree of scienter that must meet the knowledge requirement. The more closely related the alleged aider and abettor is to the primary violation, the lower the level of scienter required. *Edwards & Hanly*, 602 F.2d at 484; *Woodward v. Metro Bank*, 522 F.2d

at 97. Only if this higher level of relationship is present will recklessness suffice for the "knowledge" requirement of aiding and abetting liability.

▮ "Courts do not generally regard the accountant-client relationship as a fiduciary one." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1356 (S.D.N.Y.1982). This Court agrees and does not find that recklessness meets the second requirement of aiding and abetting here. Only conscious awareness will suffice.

Neither the affidavits submitted by plaintiff nor the testimony adduced at the Rule 43(e) hearing yielded specific probative evidence of conscious misperformance by PMM of its auditing duties, conscious avoidance of such duties or conscious disregard for such duties. There was no claim of specific probative evidence of a disregard by the auditors for whether there was a basis for the audit results; there was no evidence of absence of a genuine belief in the truth of the audit; or a reckless disregard of truth or falsity of the audit. There was nothing shown from which constructive intent to aid and abet Herbert's frauds could be inferred. Nor was PMM's failure to discover and disclose the fraud after the submission of its audit report in December 1983 sufficient to incur aiding and abetting of frauds committed by Herbert in June, November and December 1984. There was no evidence that PMM had any opportunity to discover the fraud after its 1983 auditing activities had been completed; PMM was not retained for auditing work in 1984 and was supplanted by Herbert with a new firm of accountants who performed the audit for the 14 month period from November 1983 through December 1984.

PMM did not "[s]tand[ ] idly by while knowing [it's] good name [was] being used to perpetrate a fraud," *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir.1986), because it had no knowledge of the fraud.

### *"Participations" in Banker's Acceptances*

A fundamental prerequisite to a claim under section 10(b) is the existence of a

misrepresentation made in connection with the purchase or sale of a "security" as that term is defined by the securities laws. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). If the transaction does not involve a "security," the court lacks subject matter jurisdiction.

■ The banker's acceptances allegedly purchased by two of the banks and the two savings and loan associations on whose behalf plaintiff asserts the claim were transactions or participations in non-existent Morgan Guaranty banker's acceptances with maturities of less than nine months.[10]

Banker's acceptances and participations therein with maturities not exceeding nine months are themselves exempt from the definition of "securities" under Section 3(a)(10) of the Exchange Act:

the term "security" ... shall not include ... any ... banker's acceptance which has a maturity at the time of issuance of not exceeding nine months....

15 U.S.C. § 78c(a)(10).

■ Although the complaint makes other claims, it is clear and stated in the confirmations of the transactions that what each of the financial institutions believed it purchased here was a banker's acceptance; not a participation in a banker's acceptance. Because the banker's acceptances did not exist, the only tangible evidence of the transactions and of what was being bought and sold are the confirmations sent by Parr and by Posey, Bryan & Associates, the broker on the transactions. In the "Description" section of the Parr confirmations and in the "Security Description" section of the Posey, Bryan confirmations, the same words appear: "Morgan Guaranty BA." While each bank purchased items with different values, none of the transaction documents contain references to "participations." In addition, three of the four institutions listed "Morgan Guaranty Banker's Acceptance" (or some variation of those words), not participations, on their customer claims forms for the purposes of the Parr liquidation proceedings conducted by plaintiff. Because banker's acceptances are exempt non-securities under the Exchange Act, this court has no subject matter jurisdiction over the four claims based on purchases of the banker's acceptances.

■ Even if "participations" were sold, such participations were not "securities" for the purposes of the Exchange Act.

A participation in a banker's acceptance gives the purchasers an interest in that banker's acceptance. It does not give the purchaser an undivided interest in a pool of banker's acceptances. It is only a partial interest in an exempt underlying security and shares all of the underlying banker's acceptance's attributes: e.g., risk and maturity.[11] Because a participation in a banker's acceptance does not have an identity separate from the banker's acceptance, the participation is not a "security" for purposes of the Exchange Act. However, participations in non-exempt securities are not exempt from the Exchange Act. *15 U.S.C. § 78c(a)(10); see, Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230 (2d Cir.1985) (undivided interest in a pool of exempt certificates of deposit is not an exempt security).

Furthermore, there is no reason to remove this type of short-term commercial lending transaction from the class of non-securities. *See Reves v. Ernst & Young,* — U.S. —, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). The expert testimony of Anthony Mottola at the Rule 43(e) hearing showed

---

**10.** The fact that the securities did not exist does not remove this action from the operation of the federal securities laws. *See First National Bank v. Russell,* 657 F.2d 668, 673 n. 16 (5th Cir.1981); *Pfohl v. Pelican Landing,* 567 F.Supp. 134, 138 (N.D.Ill.1983); *Goodman v. H. Hentz & Co.,* 265 F.Supp. 440, 444–45 (N.D.Ill.1967); 5 A. Jacobs, Litigation and Practice Under Rule 10b–5, § 38.03[a][i] at 2–146–47 (1989). *But see, Smith* *v. Chicago Corp.,* 566 F.Supp. 66, 68–70 (N.D.Ill. 1983) (questioning but not explicitly overruling *Goodman* in light of *Blue Chip Stamps* ).

**11.** Naturally, the sale of a participation involves a discount from the face value of the underlying banker's acceptance resulting in different interest rates.

that purchasers of participations in a banker's acceptance (generally financial institutions) are looking for a low risk, short-term, fixed interest rate investment. There is no significant secondary market for such participations; investors generally have the intention of holding the participations to maturity. Investments in participations of a banker's acceptance are investments in the short-term money market.

Because no purchase or sale of a "security" was made in four of the five transactions at issue on Count II, this Court does not have subject matter jurisdiction over those four claims for that reason alone.

### Standing of the SIPC Trustee

In Count II, Mishkin was attempting to assert claims that belong to the five financial institutions as their assignee, or as SIPC's subrogee in two cases, albeit that SIPC is not the party plaintiff herein. It was expressly the position of the liquidating trustee that he was suing solely for the benefit of the five financial institutions claiming to be Parr customers. Mishkin submitted that he is statutorily authorized to bring fraud claims against third parties on behalf of customers of the Parr estate under SIPC liquidation because the financial institutions, the customers involved, have either assigned their rights to Mishkin, the liquidator of the estate, or have taken payments from SIPC subrogating Mishkin to their customer claims.

### a. *Assignments from Banks*

As one means of asserting the claims of the financial institutions in Count II, Mishkin relies on "assignments" purporting to authorize Mishkin to pursue the claims against Peat Marwick on behalf of the financial institutions. However, plaintiff, as a SIPC trustee, is not authorized by statute to take any assignments from the three bank customers, or to assert claims of any customer bank for that matter.

Leaving aside possible infirmity arising from the fact that the "assignments" were executed in August 1987, more than one year after the filing of this lawsuit, and assuming arguendo that assignments may be taken before a commitment to pay claims is made, Mishkin still may not assert assigned claims from a banking institution.

The subsection of SIPA authorizing assignments, 15 U.S.C. § 78fff–2(b), is titled "Payments to customers" and concerns SIPC payments for net equity claims to customers.[12] However, § 78fff–2(b) specifically limits payments to the same class of customers delineated in § 78fff–3(a). § 78fff–3(a)(5) excludes banks acting on their own account, not on behalf of customers, from the definition of "customer" for purposes of SIPC advances, thereby removing the right of banks to advances for net equity claims.[13]

Furthermore, § 78fff–2(b) only allows the trustee to condition payments "pursuant to this subsection" upon the receipt of assignments. "This subsection" is specifically concerned with customers' net equity claims against the estate under SIPA liquidation. Payments "pursuant to this subsection" are payments of customer net equity claims against the estate in liquidation and nothing else. Payments of other claims are considered in other sections of SIPA. Since the SIPC trustee may not make customer net equity payments to banks, it may not make payments "pursuant to this subsection" to banks.

The claims of the three banks asserted in Count II were not net equity claims for the recovery of customer's property or money entrusted to Parr; they were claims on a supposed chose in action of its customers against a third party. The trustee had no statutory authority to act on an assignment of such a chose in action belonging to a customer. *See SIPC v. Vigman*, 803 F.2d 1513, 1520 (9th Cir.1986) (SIPC may only pursue claims when funds

---

**12.** Any payment or delivery of property pursuant to this subsection may be conditioned upon the trustee requiring claimants to execute ... assignments....
15 U.S.C. § 78fff–2(b).

**13.** The banks themselves recognized that they were not entitled to advances for net equity claims and did not make requests for such payments in their customer claim forms.

have been advanced against net equity claims).

Because assignments may only be taken as a condition of payment, the Trustee may not act on behalf of the banks. The financial institutions themselves have never asserted any claim against PMM.

b. *Subrogation*

■ Nothing in SIPA enables a SIPC, or indeed even a bankruptcy, trustee to collect money not payable to the estate in liquidation. This is clear from the language of the statute, the purpose of the statute as revealed in the legislative history, and the writings of SIPC attorneys and other commentators.

1. History of SIPA

The late 1960's saw a rash of broker-dealer failures and the concomitant loss to investors of their investments. While the New York Stock Exchange had set up a trust funded by contributions from Stock Exchange members, the Exchange was under no compulsion to compensate anyone and customers of broker-dealers that were not members of the Stock Exchange had no protection. In addition, it was clear that there was not enough money to compensate all potential claimants of insolvent broker-dealers. In order to remedy this situation, Congress enacted the Securities Investor Protection Act ("SIPA"), Pub.L. 91–598 (codified as amended at 15 U.S.C. § 78aaa *et seq.*). *See generally, SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); Bloomenthal & Salcito, *Customer Protection From Brokerage Failures; The Securities Investor Protection Corporation and the SEC*, 54 U.Colo.L.Rev. 161 (1983); Focht, *The Securities Investor Protection Act*, 501 PLI/Corp 243 (Corporate Law and Practice Course Handbook Series, Broker–Dealers 1985: Regulation and Litigation) (1985).

The House Report made clear what the primary purposes of SIPA were:

The primary purpose of the reported bill is to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles. In these circumstances public customers sometimes encounter difficulties in obtaining their cash balance or securities from broker-dealers.... The proposed legislation would provide for the establishment of a fund to be used to make it possible for the public customers, in the event of the financial insolvency of the broker, to recover that to which they are entitled....

H.R.Rep. No. 91–1613 *reprinted at* 1970 U.S.Code Cong. & Admin.News at pp. 5254, 5255.

In addition to the congressional report, the remarks of the individual senators and representatives show that the intent of the statute was to protect individual investors from losing their investments when broker-dealers failed. The purpose of the bill was to "protect[ investors] ... from losses because of the failure of their brokers." 116 Cong.Rec. 40868 (1970) (statement of Sen. Muskie); *see also id.* at 40869 (statement of Sen. Bennett); *id.* at 40885 (statement of Sen. Cranston); *id.* at 40890 (statement of Sen. Proxmire); *id.* at 40901 (statement of Sen. Brooke). "[The legislation] is intended to protect the consumers and those who invest." 116 Cong.Rec. 39346 (1970) (statement of Rep. Staggers); *see also id.* at 39352 (statement of Rep. Rostenkowski); *id.* at 39353 (statement of Rep. Anderson); *id.* at 39353–54 (statement of Rep. Rangel); *id.* at 39362 (statement of Rep. Springer).

■ The basic scheme of SIPA is to create a preferred class of creditors. Investors who had left identifiable securities in their name with the broker-dealer or who had left cash balances to be used for investment purposes with the broker-dealer (which together are referred to as "net equity claims") are entitled to receive such securities and cash from the liquidator before other creditors may share in the estate. 15 U.S.C. § 78fff.[14]

---

**14.** 15 U.S.C. § 78fff(a)(3) states:
The purposes of a liquidation proceeding ... shall be—

(1) ... (A) to deliver customer name securities ...;
(B) to distribute customer property ...;

As one means of expediting the recoveries of customers of bankrupt brokers, Congress gave SIPC the power to make advances of SIPC money for customers' net equity claims:

> (a) **Advances for Customer Claims.**—In order to provide for prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall advance to the trustee such moneys ... to pay or otherwise satisfy claims ...

15 U.S.C. § 78fff-3.

Originally set at a maximum of $50,000, Congress, in 1980, raised the amount that may be advanced to $500,000, no more than $100,000 of which may be in cash. Pub. Law. 96–433 (codified at 15 U.S.C. § 78fff-3).

The ability quickly to pay off net equity claims of customers is the most important feature of SIPA. *See* 116 Cong.Rec. 39353 (statement of Rep. Anderson) ("The important aspect of this provision is the prompt payment feature which avoids lengthy delay which otherwise might result if customers had to wait until the completion of the liquidation proceeding."); 116 Cong.Rec. 40905 (statement of Sen. Bennett) ("The protection afforded by this bill could not be effective unless the means were given for those customers to promptly receive their securities. This is the basic purpose of the legislation.").

In return for advances made to customers, SIPC becomes subrogated to the net equity claims of such customers against the debtor. 15 U.S.C. § 78fff-3(a). Only the two savings and loan associations received advances from SIPC.

### 2. Standing to Assert Subrogation Rights

As outlined above, SIPC is subrogated to customer claims it pays off. The subrogation rights that may be enforced are those "provided in this chapter." 15 U.S.C. § 78fff(a)(3). The *only* subrogation rights "in this chapter" are found in §§ 78fff-3(a) and 78fff-4(c). Because the subrogation rights found in § 78fff-4 are not applicable

(3) to enforce rights of subrogation as provided in this chapter; and

to a liquidation proceeding, the subrogation rights in issue here are those found in § 78fff-3(a) which reads, in relevant part:

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have in law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter ...

"Claims of customers" are defined as net equity claims against the debtor. *Id.* They are not claims that third parties have defrauded a customer. *Cf.,* 15 U.S.C. § 78fff-4(c) ("SIPC shall be subrogated to the claims of such customers against the member."); *see also* Focht, *The Securities Investor Protection Act, supra* ("SIPC [is] subrogated to customer claims paid").

The fact that the Trustee is subrogated only to claims [as defined in the statute] against the debtor is also made clear in § 78fff-2(c)(1)(C) which provides for the allocation of customer property upon liquidation of a broker-dealer. Third in line in the allocation is "SIPC as subrogee for the claims of customers." In other words, SIPA provides for SIPC's recovery as subrogee to come from the estate of the debtor.

Besides the congressional debates and the language of the statute, the courts have stated that SIPA was never intended to protect claims against third parties based on fraud and that the trustee may not sue for such claims. *See SIPC v. Vigman*, 803 F.2d at 1517 n. 1:

> SIPC's allegations show a fraudulent market manipulation scheme which, if true, might support securities fraud recoveries for those in the class action who bought stock at inflated prices and held either the stock or a net equity claim for it when prices fell.

> For example, if a broker used fraudulent means to convince a customer to purchase a stock and the customer left that stock with the broker, who subsequently

(4) to liquidate the business of the debtor.

became insolvent, SIPC would be required by SIPA only to return the stock to the customer.... *The customer would retain any securities fraud claim against the broker for inducing the purchase.* [emphasis supplied]

If the stock in question were missing from the broker's inventory ... [h]ere too the customer would retain any securities fraud claim against the broker for inducing the original purchase.;

*see also SIPC v. Charisma Sec. Corp.*, 371 F.Supp. 894, 899 n. 7 (S.D.N.Y.), ("general contract and fraud claims as well as claims for market losses against brokerage houses are not included in the insurance umbrella afforded by SIPC ...."), *aff'd*, 506 F.2d 1191 (2d Cir.1974); *In re Government Securities Corp.*, 90 B.R. 539, 541 (S.D.Fla. 1988) ("[I]t seem plain that SIPA's primary intent and policy are to protect customer securities being held for them by a broker-dealer, rather than to serve as a vehicle for the litigation of claims of fraud or violations of Rule 10b–5." (quoting *In re MV Securities, Inc.*, 48 B.R. 156, 160 (S.D.N.Y. 1985))); Focht, *The Securities Investor Protection Act, supra* (citing cases).

 In sum, SIPA was intended only to protect individual investors from the loss of their investment if the broker-dealer became insolvent. In order to speed their recovery of their investments, SIPC was authorized to advance payments of the customer's net equity claim against the estate. In return, SIPC (not a SIPC trustee) becomes subrogated to such claims of customers against the estate.

Policy issues are also implicated here. If SIPC were allowed to press fraud claims of individual customers against third parties it would defeat the purpose of the preference system set up by Congress.

Count II is *not* an action for retrieval of customer property. It is an action for securities law fraud. Pursuit of such a claim by a liquidating trustee is preferential to those who would recover.

c. *Common Law Subrogation Rights*

 Plaintiff argues that even if the statute does not explicitly grant SIPC the subrogation rights claimed here, the Second Circuit Court of Appeals, in *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir.1978), *rev'd on other grounds*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), found that SIPC has a "general common-law right of equitable subrogation." *Id.* at 624.

The Supreme Court expressly did not consider this question in reversing on other grounds. 442 U.S. at 567 n. 9, 99 S.Ct. at 2484 n. 9.

In reaching its decision, the circuit court relied on a common-law right stated in 31 N.Y.Jur., *Insurance* § 1620 at 510. However, SIPA is not an insurance statute and was not intended to be an insurance-type statute. Its roots are in section 60(e) of the old Bankruptcy Act. 11 U.S.C. § 96(e) (1976). *See* 116 Cong.Rec. 40905 (1970) (Statement of Sen. Bennett) (SIPA liquidations "are to be conducted as if they were under section 60(e) of the Bankruptcy Act, which section is the present bankruptcy law governing the liquidation of stockbrokers.... The actual liquidation procedure will be conducted in accordance with, and as though it were being conducted under the provisions of Chapter 10 of the Bankruptcy Act...."); Focht, *The Securities Investor Protection Act, supra*. The Second Circuit had previously rejected an analogy to the Federal Deposit Insurance Act (FDIA). The court stated:

> SIPA and FDIA are independent statutory schemes, enacted to serve the unique needs of the banking and securities industries, respectively. The Congress recognized this when it rejected several early versions of the SIPA bill which were patterned on FDIA *and which extended insurance coverage* to certain beneficial interests represented by customer accounts.

*SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 (2d Cir.) (emphasis supplied), *cert. denied, sub nom., Trustees of Reading Body Works Inc. v. SIPC*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976). An application of insurance principles of

subrogation is seemingly inappropriate.[15]

■ Nor did the addition of the words "in addition to all other rights it may have at law or in equity" to what is now § 78fff–3(a) give the trustee the power to bring this claim. § 78fff–1 expressly limits the powers and duties of a SIPA trustee. The trustee may only exercise the same powers as a bankruptcy trustee plus those additional powers granted by SIPC.[16] 15 U.S.C. § 78fff–1(a); *see also* S.Rep. 95–763 *reprinted in* 78 U.S.Code Cong. & Admin. News at pp. 764, 775 (same). The liquidating trustee is not granted the power to bring fraud claims against third parties on behalf of customers.

Regardless of the subrogation of the claims of the two savings and loan associations (St. Clair and City Federal), SIPC has not sued herein. Moreover, the bankers acceptances which they purchased are exempt from the Exchange Act; they are not securities under federal law.

### Conclusion on Both Counts

On both counts, the complaint is dismissed in all respects, with costs. The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

So ordered.

---

**15.** This is the position cogently stated by the dissent in *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir.1978), *rev'd on other grounds*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Judge Mulligan wrote:

By what alchemy a congressionally created corporation with limited powers to litigate, see *Securities Investor Protection Corp. v. Barbour* ... can now sue in a federal court for an alleged violation of ... the '34 Act, is not made clear. When Congress created SIPC, its express but limited rights of subrogation were spelled out in SIPA.... As the majority recognizes, those claims to which SIPC is subrogated by statute are clearly against the debtor's estate only and no rights against the accountant flow therefrom. Since Congress has delineated the subrogation

rights of SIPC, its failure to provide for subrogation against any third party would clearly dictate that none exist under the ... principle: *expressio unius est exclusio alterius*.... The effect of the majority's extension of SIPC's subrogation rights is to circumvent the intent of Congress by ignoring the directive of SIPA that SIPC be subrogated *"with the rights and priorities provided in this [chapter]."* 15 U.S.C. § 78fff[–3(a) ].

*Id.* at 634–35 (Mulligan, J., dissenting) (citation omitted).

**16.** A bankruptcy trustee does not have standing to sue third parties for fraud on behalf of individual creditors. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).