**SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff-Appellant,**

v.

**Seymour VIGMAN, et al.,
Defendants-Appellees.**

No. 85–5786.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1986.

Submission Withdrawn July 14, 1986.

Resubmitted Nov. 7, 1986.

Decided Nov. 7, 1986.

Roy G. Wuchitech, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for plaintiff-appellant.

David L. Ross, Greenberg, Traurig, Askew, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Fla., for defendants-appellees.

Before WRIGHT, NELSON and KOZINSKI, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Seventy-five defendants allegedly engaged in a fraudulent scheme of stock market manipulation that ultimately caused the failure of two securities brokerages and the loss of many of the brokerage customers' securities and cash. Appellant, Securities Investor Protection Corporation (SIPC), liquidated the brokerages and reimbursed their customers for the value of the cash and securities as of the liquidation.

SIPC sued the brokers and the third-party defendants as subrogee of the brokers' customers and in its own right. It alleged several theories of liability, one being securities fraud under Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) (1982); 17 C.F.R. § 240.10b–5 (1984) (the Exchange Act claims). The court dismissed the Exchange Act claims on the ground that SIPC could not satisfy the purchase-or-sale requirement of an Exchange Act securities fraud claim.

## PROCEDURAL BACKGROUND

In July 1981, SIPC instituted liquidation proceedings against two securities brokerages, First State Securities Corporation (FSSC) and Joseph Sebag Incorporated (Sebag) (collectively "the brokerages" or "the brokers"). SIPC brought suit in July 1983, after disbursing the brokerages' assets and reimbursing their customers for the difference between their statutory claims and the brokerage assets. The complaint alleged, among other claims, securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. *See Securities Investor Protection Corporation v. Vigman*, 764 F.2d 1309, 1312 (9th Cir.1985) (previous appeal of this case, reversing and remanding dismissal, based on personal jurisdiction and venue, of two defendants).

The district court consolidated *Cain v. Vigman*, No. CV–83–5674–AWT (C.D.Cal.) with SIPC's action. The *Cain* case is a class action by the brokerages' customers against the defendants. After allowing an amendment to SIPC's complaint, the district court orally granted the defendants' consolidated motion under Fed.R.Civ.P. 12(b)(6) to dismiss SIPC's Exchange Act claims, holding that SIPC lacked standing to assert those claims. The court reasoned that the *Cain* class would "be the more appropriate plaintiff." It entered final judgment on those claims under Fed.R. Civ.P. 54(b).

SIPC appealed. After we heard oral argument and submitted the appeal for decision, we withdrew submission to allow the parties to submit supplemental briefs on several questions that we propounded. The Securities Exchange Commission submitted an amicus brief, which we found helpful. We now order the appeal resubmitted for decision.

## FACTS

SIPC alleges that, from 1964 through July 1981, the defendants engaged in a scheme to inflate the prices for the stocks of six companies. The scheme was carried out by cooperation among the defendants, who were officers and directors of the six companies and principals and employees of the brokerages.

SIPC alleges that the six companies' prospects were misrepresented through statements by company officials, press releases and financial statements. The illusion of active markets in the six stocks was allegedly maintained by misleading transactions in the defendants' accounts, in the brokerage proprietary accounts, and in accounts of unsuspecting customers.

When the scheme was uncovered, the prices of the six stocks fell drastically. Because the defendants had allegedly prostituted the brokerages by loading the proprietary accounts with the stock of the six companies, SIPC placed the brokerages under a protective decree in July 1981. In the process of liquidating the brokerages, SIPC allegedly had to disburse nearly $13 million to meet customers' claims for which the brokerages' assets were insufficient.

STANDARD OF REVIEW

This court reviews *de novo* a dismissal for failure to state a claim. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533 (9th Cir.1984). The dismissal will be affirmed only if it appears beyond doubt that under no set of facts could the plaintiff be entitled to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Simon Oil Co. v. Norman*, 789 F.2d 780, 781 (9th Cir. 1986).

ANALYSIS

A. *Extent of SIPC Subrogation*

In their briefs, the parties argued vigorously over the extent of SIPC's subrogation rights. At oral argument, they seemed to agree on this question. But we set forth briefly the law on this subject to avoid misunderstanding.

■ SIPC is a nonprofit corporation created by the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa–78*lll* (1982) (SIPA). It protects, from a broker's financial failure, the customers of securities brokers by insuring the net equity of customers' accounts up to specified maxima. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 564–65 n. 5, 99 S.Ct. 2479, 2483, 61 L.Ed.2d 82 (1979).

SIPC is obligated to insure only the value of brokerage customers' "net equity" as of the initiation of the liquidation proceedings. *See* 15 U.S.C. §§ 78fff–3(a), 78*lll* (11) (1982). "Net equity" is a term defined in the Securities Investor Protection Act (SIPA). *See* 15 U.S.C. § 78*lll* (11) (1982). It is the amount that the broker would have owed each customer had it liquidated all the customer's holdings on the date the SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker. *Id.*

■ Under SIPA, a trustee may be appointed to return customer property, complete open transactions, enforce rights of subrogation and liquidate the business of the brokerage. 15 U.S.C. §§ 78eee(b)(3), 78fff–1, 78fff–2; *see SIPC v. Barbour*, 421 U.S. 412, 417, 95 S.Ct. 1733, 1737, 44

L.Ed.2d 263 (1975). SIPC is required to advance the trustee necessary funds to complete open transactions and return customer property up to specified maxima. *Barbour*, 421 U.S. at 417, 95 S.Ct. at 1737; *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 564–65 n. 5, 99 S.Ct. 2479, 2483, 61 L.Ed.2d 82 (1979) (description of SIPC); *SEC v. Securities Northwest, Inc.*, 573 F.2d 622, 624 (9th Cir.1978) (same). To the extent SIPC advances funds, either to the trustee or directly to brokerage customers, it is subrogated to customers' claims. 15 U.S.C. §§ 78fff–3(a), 78fff–4(c). If customers could have recovered on an Exchange Act securities fraud claim for the monies advanced, then SIPC, as subrogee, could do so.

B. *Securities Fraud Claims*

The district court dismissed SIPC's Exchange Act claims because SIPC could not meet the purchase-or-sale requirement for standing to bring a private cause of action under Rule 10b–5.

SIPC asserts that the customers could have stated Exchange Act claims for the losses they would have suffered, had SIPC not reimbursed them. Instead of alleging specific purchases or sales that were tainted by the fraudulent scheme, however, SIPC contends that it may rely on any purchase or sale that was "touched" by fraud, *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971), to support its claims for the missing funds and securities. "The touch test, however, is nothing more than a restatement of the 'in connection with' test." *In re Financial Corp. of America*, 796 F.2d 1126, 1130 (9th Cir.1986).

1. *Birnbaum Rule*

■ In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Court adopted the *Birnbaum* rule, which requires a purchase or sale of a security for standing to sue on an implied cause of action under Section 10(b) of the Exchange Act and Rule

10b–5. *See also Mosher v. Kane*, 784 F.2d 1385, 1388 (9th Cir.1986). Under the *Birnbaum* rule, in order for SIPC to have stated an adequate subrogation claim, the fraud *loss* must be *connected to* the *purchase* or *sale* of a security before the customers were fully aware of the facts and before the deception had ended. *See Shivers v. Amerco*, 670 F.2d 826, 830 (9th Cir. 1982) (citing *Ohashi v. Verit Industries*, 536 F.2d 849, 852–53 (9th Cir.), *cert. denied*, 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976); and *O'Brien v. Continental Illinois National Bank & Trust Co.*, 593 F.2d 54, 58 (7th Cir.1979)).

SIPC's argument, that it may rely on any sale or purchase made by customers during the time of the alleged fraudulent activity, does not persuade us. The fraud that it alleges must be causally related to the claims to which it is subrogated. *See Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir.1984). Furthermore, it is not enough to say merely that the fraud caused the liquidation of the brokerage firm. *See In re Financial Corp. of America*, 796 F.2d at 1130 (discussing the causation element of the "in connection with" requirement). The liquidation could have resulted in no subrogation at all had the customers' net equity claims been met by brokerage assets.[1]

SIPC contends that when it paid customers the value of missing securities, it constructively purchased them, and may now sue in its own right as purchaser. *See Rich v. Touche Ross & Co.*, 415 F.Supp. 95, 99–100 (S.D.N.Y.1976) (holding that "SIPC liquidation qualifies as a sale" with respect to the customer, "where and to the extent customers' claims to specific shares are satisfied in cash"). We decline to accept this argument. Contrary to the holding in *Rich*, the SIPC liquidation did not "convert" securities into cash, as the securities had disappeared before liquidation. SIPC never received securities for its "purchase price." Garden variety conversion of securities does not become a purchase or sale merely because an insurer has later reimbursed the loss.

To further support its Exchange Act claims, SIPC alleges specific fraudulent transactions by the brokerages. It also contends, under a theory resembling *res ipsa loquitur*, that its payment of nearly $13 million to meet the customers' net equity claims should support an Exchange Act claim. These allegations fail to support a

---

**1.** Without more, had the brokerages held every share of stock they should have, there would have been no subrogation link to *securities* at all, regardless of how much cash was missing or how little the shares of the stock were worth. SIPC is required to reimburse customers for the value of the securities "as of the close of business on the filing date." 15 U.S.C. § 78fff–2(c)(1). In reimbursing customers for their securities, it has the option of delivering the named securities, or securities of the same description. *See SEC v. Albert & Maguire Securities Co.*, 560 F.2d 569, 573 (3d Cir.1977); *Rich v. Touche Ross & Co.*, 415 F.Supp. 95, 99–100 (S.D.N.Y.1976); *SEC v. S.J. Salmon & Co.*, 375 F.Supp. 867, 870–71 (S.D.N.Y.1974).

SIPC's allegations show a fraudulent market manipulation scheme which, if true, might support securities fraud recoveries for those in the class action who bought stock at inflated prices and held either the stock or a net equity claim for it when prices fell.

For example, if a broker used fraudulent means to convince a customer to purchase a stock and the customer left that stock with the broker, who subsequently became insolvent,

SIPC would be required by SIPA only to return the stock to the customer. 15 U.S.C. § 78fff–2(c)(2); *see also In re June S. Jones Co.*, 52 B.R. 810 (D.Or.1985). The customer would retain any securities fraud claim against the broker for inducing the purchase.

If the stock in question were missing from the broker's inventory of stocks, SIPC could return to the customer the value of the stock as of the date of filing a protective decree, 15 U.S.C. § 78fff–2(b), or, if it could purchase the stock in an orderly market, SIPC could· deliver other shares of the same class in the same company to satisfy the customer's claim, 15 U.S.C. § 78fff–2(d). Here too, the customer would retain any securities fraud claim against the broker for inducing the original purchase. SIPC would be entitled to assert a claim, though not necessarily a securities fraud claim, against the broker for the missing stock.

The importance of the proper allocation of claims is evident by the consolidated class action pending before the district court, in which the brokerage customers are pressing claims against the defendants. The class action claims, however, are not before us.

**1518**

claim under a strict application of the *Birnbaum* rule.

## 2. Exceptions to **Birnbaum** Rule

The *Birnbaum* rule has not been applied without flexibility, as the Court recognized in *Blue Chip Stamps,* 421 U.S. at 751, 95 S.Ct. at 1932. *See also In re Financial Corp. of America,* 796 F.2d at 1129 (quoting *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615, 619 (9th Cir.1981)). Three doctrines that ease the strictures of the *Birnbaum* rule have developed.

### a. *Aborted Seller*

■ The first is the aborted seller or purchaser doctrine. This proceeds on the strength of § 3(a)(13)–(14) of the Exchange Act, which includes contracts to purchase and contracts to sell within the definitions of "purchase" and "sell." 15 U.S.C. § 78c(a)(13)–(14). *See Ohashi,* 536 F.2d at 853 (quoting *Mount Clemens Industries, Inc. v. Bell,* 464 F.2d 339, 345 (9th Cir. 1972)). If a plaintiff had a contract to buy or sell a security, the contract right will satisfy the *Birnbaum* rule, even if the contract were breached. *Mosher v. Kane,* 784 F.2d 1385, 1389 n. 5 (9th Cir.1986). *But see Lewelling v. First California Co.,* 564 F.2d 1277, 1279 (9th Cir.1977) (aborted seller does not satisfy *Birnbaum* if plaintiff-seller induced to *retain* securities through defendants' fraud).

### b. *Pledge Seller*

■ The second modification of the *Birnbaum* rule is the pledge doctrine. Under this doctrine, when stock is pledged as collateral for a loan, the pledgor has constructively sold the stock and the pledgee constructively bought it, even though no foreclosure has taken place. *See Rubin v. United States,* 449 U.S. 424, 429–31, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981) (pledge is a "sale" for purposes of fraud claim under § 17(a) of Securities Act of 1933); *United States v. Kendrick,* 692 F.2d 1262, 1265 (9th Cir.1982) (pledge of securities constitutes a sale under Rule 10b–5),

*cert. denied,* 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). *But see In re Financial Corp. of America,* 796 F.2d at 1130 (insufficient that defendant " 'has committed a proscribed act in a transaction of which the pledge of a security is a part' ") (quoting *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)).

### c. *Forced Seller*

■ The third doctrine ameliorating the *Birnbaum* rule is the forced seller doctrine which arose in connection with mergers in which a plaintiff alleged fraud in the procurement of the merger. *See Shivers v. Amerco,* 670 F.2d at 830 (discussing *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967)). After a merger is approved, a stockholder, under most state laws, has two choices: exchange the original stock for the securities and/or cash specified as the purchase price in the merger agreement, or exercise statutory appraisal rights and have the court determine the value of the shares. *See, e.g., Vine,* 374 F.2d at 633–34. In either event, there is the equivalent of a forced sale whenever a shareholder's investment substantially changes its character or when a shareholder is forced to accept a liquidated value for his shares. *See Mosher,* 784 F.2d at 1389.

■ Without modification, the application of none of these three doctrines is sufficient to overturn the district court's dismissal of SIPC's Exchange Act claims.

SIPC alleges that customers' requests to sell securities were ignored as a part of the defendants' fraudulent scheme. This does not give SIPC standing under the aborted seller doctrine. At most it provides the plaintiff class a claim for breach of the brokers' fiduciary duty. Further, the alleged failure to sell is not causally related to SIPC's net equity losses, because SIPC is required to reimburse customers only for the securities in customers' accounts as of

liquidation. Since the securities were never sold, SIPC had only to deliver them.

SIPC alleges that FSSC pledged its customers' securities as collateral for loans to FSSC. In cases that have applied the pledge doctrine the pledgor owned the security. The pledge was a sufficient substitute for a sale and purchase. Here, SIPC has alleged that the brokers pledged customers' stock. Thus the pledge doctrine cases are not directly on point.

The forced seller doctrine is probably SIPC's strongest basis for establishing its standing to assert Exchange Act claims. If the Exchange Act provides a remedy in those cases in which "a defendant is engaged in a scheme for the purpose of forcing the plaintiffs to convert their shares for money or other considerations," *Mosher*, 784 F.2d at 1389, arguably it should also provide a remedy where the defendants' scheme results in complete conversion of their shares. *See, e.g., Berner v. Lazzaro*, 730 F.2d 1319, 1322–23 (9th Cir.1984) (discussing purposes of private § 10(b) actions in connection with *in pari delicto* defense) *aff'd sub nom., Eichler v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985); *Alley v. Miramon*, 614 F.2d 1372, 1386–87 (5th Cir.1980) (approving application of Rule 10b–5 where defendant fraudulently obtained plaintiff's stock and liquidated the corporation). SIPC alleges that it has paid nearly $13 million, including costs and administrative expenses, to satisfy net equity claims. For every security that the brokers were supposed to be but were not holding for customers, the customers had claims for the value of the securities at time of liquidation. *See Rich*, 415 F.Supp. at 99–100.

For essentially the same reason that we rejected SIPC's "constructive purchase" theory, we reject its forced sale theory. The analysis proves too much. Were we to apply the forced seller doctrine to every instance in which SIPC liquidates a brokerage and satisfies customer claims with cash, we would eliminate the purchase-or-sale requirement. Simple thefts and conversions would become forced sales merely because an insurer reimbursed the loss. The *Birnbaum* rule binds us. Until the Supreme Court repudiates it, we are unable to do so. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–80, 97 S.Ct. 1292, 1302–04, 51 L.Ed.2d 480 (1977).

### 3. *Valid Claims*

Even though we hold that SIPC has shown, under the established exceptions to the *Birnbaum* rule, no set of facts under which it would be entitled to Exchange Act relief, we are unconvinced that no set of facts could be proven that would entitle it to Exchange Act relief. There are many reasons why the securities that FSSC and Sebag were supposed to be holding could be missing. "[S]ecurities belonging to customers may have been lost, improperly hypothecated, misappropriated, never purchased or even stolen...." S.Rep. No. 95–763, *reprinted in* 1978 U.S. Code Cong. & Ad.News 764, 765. Most of these reasons would not satisfy the purchase-or-sale requirement of *Blue Chip Stamps*.

SIPC has alleged, however, that the defendants made unauthorized transactions in customers' accounts as part of their fraudulent scheme. If so, some of those transactions could satisfy the *Birnbaum* rule. Where a broker abuses his customer's trust through unauthorized transactions, there is no reason why the *Birnbaum* rule should not be applied flexibly. We hold that when a broker makes an unauthorized purchase or sale of securities with his customer's assets, that purchase or sale may be attributed to the customer for purposes of satisfying the *Birnbaum* rule.[2] *See Smoky Greenhaw Cotton Co. v.*

---

**2.** Examples of unauthorized transactions in which the broker's purchase or sale should be attributed to the customer include:

    1. Those in which a broker acting as a bailee of his customer's cash, *see Rich*, 415 F.Supp. at 99, uses the funds without authorization to purchase securities;

    2. Those in which a broker acting as bailee of his customer's securities sells or pledges the securities without authorization.

**1520**

Merrill Lynch, Pierce, Fenner & Smith, Inc., 785 F.2d 1274, 1277 (5th Cir.1986) (unauthorized commodity trades). Allowing an Exchange Act claim for such a transaction implicates none of the concerns before the Court in *Blue Chip Stamps. See* 421 U.S. at 737–49, 95 S.Ct. at 1926–31.

█ Under our holding, the district court erred in dismissing SIPC's Exchange Act claims. Our conclusion applies to SIPC, of course, only if it reimbursed a customer for the cash or securities the brokers were *supposed to be holding*, that is, the net equity of the customer's account before the unauthorized transactions. If the customer's reimbursement were based on the net equity of his or her account as though the transactions were authorized, that is, the net equity of the account after the unauthorized transactions, then the customer, not SIPC, has standing to assert the Exchange Act claim. In that case, SIPC would be relegated to more pedestrian theories, such as conversion, to recover on the claim to which it is subrogated.

CONCLUSION

The district court did not err in dismissing SIPC's Exchange Act claims under a strict application of the *Birnbaum* rule. Nor did it err under any of the current doctrines ameliorating the harsh effect of the rule. We hold, however, that a broker's unauthorized purchase or sale of securities using a customer's assets may be attributed to the customer, and through the customer to SIPC, satisfying the purchase-or-sale requirement for an Exchange Act claim. Since a set of facts exists under which SIPC may be entitled to relief, we must allow SIPC an opportunity to prove those facts.

REVERSED and REMANDED.

In these cases, the purchase or sale made by the broker "passes through" to the customer for purposes of the *Birnbaum* rule. If on remand, however, SIPC can show no more than that the cash or securities are missing and cannot show

that the broker engaged in an unauthorized transaction, no purchase or sale has been shown and recovery under section 10(b) or rule 10b–5 is inappropriate.