# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 16, 2013         Decided July 18, 2014

No. 12-5286

SECURITIES AND EXCHANGE COMMISSION,
APPELLANT

v.

SECURITIES INVESTOR PROTECTION CORPORATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-mc-00678)

*John W. Avery*, Deputy Solicitor, Securities and Exchange Commission, argued the cause for appellant. With him on the briefs were *Michael A. Conley*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, *Tracey A. Hardin*, Assistant General Counsel, and *Michael L. Post*, Senior Litigation Counsel.

*Robertson Park*, *John Heffner*, and *Mark J. Andrews* were on the brief for *amici curiae* Stanford Victims Coalition, et al. in support of petitioner.

*Michael W. McConnell* argued the cause for appellee. With him on the brief were *Eugene F. Assaf*, *Edwin J. U*, *John C. O'Quinn*, *Elizabeth M. Locke*, and *Josephine Wang*.

*Thomas J. Moloney*, *David Y. Livshiz*, *Darryl G. Stein*, and *Sarah E. Edwards* were on the brief for *amicus curiae* Securities Industry and Financial Markets Association in support of appellee.

*Steven P. Lehotsky*, *Joshua S. Press*, and *Noah Levine* were on the brief for *amici curiae* former SEC officials and professors of law in support of appellee.

*Steuart Thomsen* was on the brief for *amicus curiae* Financial Services Institute, Inc. in support of appellee.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*:  When a brokerage firm faces insolvency, the cash and securities it holds for its customers can become ensnared in bankruptcy liquidation proceedings or otherwise be put at risk.  Congress established the Securities Investor Protection Corporation (SIPC) to protect investors' assets held on deposit by financially distressed brokerage firms. SIPC can initiate its own liquidation proceedings with the aim of securing the return of customers' property held by the brokerage.  SIPC, however, possesses authority to undertake those protective measures only with respect to member brokerage firms.  Its authority does not extend to non-member institutions.

In this case, the Securities and Exchange Commission seeks a court order compelling SIPC to liquidate a member broker-dealer, Stanford Group Company (SGC).  SGC played an integral role in a multibillion-dollar financial fraud carried out through a web of companies.  SGC's financial advisors

counseled investors to purchase certificates of deposit from an Antiguan bank that was part of the same corporate family. The Antiguan bank's CDs eventually became worthless. The massive Stanford fraud spawned a variety of legal actions in a number of arenas, the bulk of which are not at issue here. This case involves the authority of a specific entity—SIPC—to take measures within its own statutorily bounded sphere. As to that issue, because the Antiguan bank, unlike SGC, was not a SIPC member, SIPC had no ability to initiate measures directly against the bank to protect the property of investors who purchased the bank's CDs.

The question in this case is whether SIPC can instead be ordered to proceed against SGC—rather than the Antiguan bank—to protect the CD investors' property. It is common ground that SIPC can be compelled to do so only if those investors qualify as "customers" of SGC within the meaning of the governing statute. SIPC concluded that they do not, and the district court agreed. The court reasoned that the investors obtained the Antiguan bank's CDs by depositing funds with the bank itself, not with SGC, and they thus cannot be considered customers of the latter. We agree that the CD investors do not qualify as customers of SGC under the operative statutory definition. We therefore affirm the denial of the application to order SIPC to liquidate SGC.

I.

A.

In 1970, Congress enacted the Securities Investor Protection Act (the Act or SIPA) in response to the "failure or instability of a significant number of brokerage firms." *Sec. Investor Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975). Before the Act, customers of a brokerage firm that fell into

insolvency often "found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings." *Id.* The Act created SIPC, a nonprofit, private membership corporation established "for the purpose, *inter alia*, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit." *Id.* at 413; *see* 15 U.S.C. § 78ccc(a)(1). Congress required most registered U.S. broker-dealers to become members of SIPC and to pay assessments used to fund SIPC's investor protection measures. *See* 15 U.S.C. §§ 78ccc(a)(2)(A), 78ddd(c).

The Act requires the SEC and various industry self-regulatory organizations to notify SIPC upon learning that a SIPC-member firm "is in or is approaching financial difficulty." 15 U.S.C. § 78eee(a)(1). SIPC may file an action for a protective decree in federal district court after determining, among other things, that the member firm "has failed or is in danger of failing to meet its obligations to customers." 15 U.S.C. § 78eee(a)(3)(A). If the court grants SIPC's application, the court must appoint a trustee and order the proceedings removed to bankruptcy court. 15 U.S.C. § 78eee(b)(3), (4). The trustee then oversees the liquidation of the member firm, returning any customer cash and securities on deposit with the broker. 15 U.S.C. § 78fff. If the insolvent broker's funds prove inadequate to pay all customer claims, SIPC itself must cover any shortfalls up to statutory limits. 15 U.S.C. § 78fff-3.

The Act gives the SEC "plenary authority to supervise . . . SIPC" in its implementation of the statute. *Barbour*, 421 U.S. at 417 (internal quotation marks omitted). For instance, the SEC "may disapprove in whole or in part any bylaw or rule adopted by the Board of Directors of . . . SIPC, or require the adoption of any rule it deems appropriate." *Id.* (citing 15 U.S.C. § 78ccc(e)). The SEC may also "participate in any liquidation proceeding initiated by . . . SIPC." *Id.* Of particular relevance

here, if SIPC declines to initiate the liquidation of a member firm, the SEC can apply to the district court for an order requiring SIPC to commence liquidation. *See* 15 U.S.C. § 78ggg(b). This case marks the SEC's first effort to invoke its authority under § 78ggg(b) to compel SIPC to initiate liquidation proceedings against a member brokerage.

For the district court to issue such an order, the SEC must show that SIPC has failed to "act for the protection" of the member firm's "customers." *Id.* The statutory term "customer" encompasses persons for whom the member firm holds securities or cash on deposit. The Act states that the "term 'customer' of a debtor means any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer." 15 U.S.C. § 78*lll*(2)(A). The Act further explains that the term "customer" includes "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2)(B)(i). The Act thereby includes within the definition of "customer" those persons for whom the member firm holds cash or securities on deposit for the *customer*'s use. Significantly, however, the Act specifically excludes persons who give cash or securities to the member firm for the *firm*'s use as part of the firm's capital (e.g., as a loan to the member firm): "The term 'customer' does not include any person, to the extent that . . . such person has a claim for cash or securities which . . . is part of the capital of the debtor." 15 U.S.C. § 78*lll*(2)(C).

6

B.

This case arises out of a massive financial fraud perpetrated by Robert Allen Stanford.  As described by the SEC, Stanford conducted a "Ponzi scheme," selling certificates of deposit to investors but then misappropriating billions of dollars in deposited funds to repay earlier investors and finance a lavish lifestyle.  *See generally Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1064-65 (2014).

Stanford employed a complex web of companies he owned or controlled to carry out the fraudulent enterprise.  Two entities are primarily at issue here: (i) Stanford International Bank, Ltd. (SIBL), a bank organized under Antiguan law, and (ii) Stanford Group Company (SGC), a Houston-based broker-dealer registered with the SEC.  SIBL sold certificates of deposit, "debt assets that promised a fixed rate of return." *Chadbourne*, 134 S. Ct. at 1064 (internal quotation marks omitted).  SGC employees actively promoted the SIBL CDs to investors.  SGC was a member of SIPC, while SIBL was not.

The parties stipulated to certain facts concerning the sales of SIBL CDs.  To purchase a CD, "an investor had to open an account with SIBL.  CD investors wrote checks that were deposited into SIBL accounts and/or filled out or authorized wire transfer requests asking that money be wired to SIBL for the purpose of opening their accounts at SIBL and purchasing CDs." J.A. 952.  "Most . . . investors either received the physical CD certificates or had them held by an authorized designee." J.A. 953.  SGC, for its part, did not itself hold CD certificates for investors.  "To the extent that some SIBL CD investors did not receive the physical certificates, the SEC is not relying on that fact to support its claims in this proceeding." *Id.* CD investors "received periodic statements from SIBL reflecting the balances in their SIBL accounts." *Id.*

Disclosure statements for SIBL CDs sold in the United States stated that "SIBL's products are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance [sic] Corporation." *Id.* A version of the CD marketing brochure reiterated that the CDs were not covered by U.S. investor protection laws, and further stated that there was "no guarantee investors will receive interest distributions or the return of their principal." *Id.* Despite those written warnings, some investors report being told by SGC representatives that the SIBL CDs were covered by U.S. investor protection laws, including the Act.

Stanford's extensive financial fraud was met with a variety of legal responses. In 2009, the SEC filed a civil enforcement action in federal district court against Stanford, SGC, SIBL, and others. The court appointed a receiver for SGC and other entities. The receiver determined that SIBL CDs worth approximately $7.2 billion were outstanding worldwide as of February 2009. The SEC ultimately prevailed, and the court imposed a civil penalty of $6 billion. *See Chadbourne*, 134 S. Ct. at 1064-65. Stanford himself was convicted in 2012 of conspiracy, wire fraud, mail fraud, obstruction of justice, and money laundering. He was sentenced to 110 years of imprisonment and ordered to forfeit approximately $6 billion. *Id*. at 1064, 1070. Antiguan authorities separately initiated proceedings to liquidate SIBL and process claims against the bank. SIBL CD investors also brought class action lawsuits against law firms, investment advisors, and other entities that allegedly assisted Stanford in perpetrating the fraud. *See Chadbourne*, 134 S. Ct. at 1062, 1065 (finding that four such class action suits were not barred by federal securities statutes and could proceed).

C.

This case involves the prospect of a distinct response to the Stanford fraud: an action by SIPC to liquidate SGC. In August 2009, the court-appointed receiver in the SEC's civil enforcement action asked SIPC to determine whether it would liquidate SGC in order to protect the assets of investors who had purchased SIBL CDs at the suggestion of SGC employees. SIPC responded that it found no basis under the Act to initiate a liquidation of SGC. In SIPC's view, the CD investors were not SGC "customers" within the meaning of the Act, a precondition to liquidation of SGC. SIPC explained that the Act "protects the 'custody' function that brokerage firms perform for customers." J.A. 158. Here, SIPC concluded, the circumstances fell outside the Act's custody function because SGC itself never held investors' cash or securities in connection with their purchase of the CDs. Rather, "cash for the purpose of purchasing CDs . . . was sent to SIBL, which is precisely what the customer intended." J.A. 160. As for the "physical CDs," they presumably "were issued to, and delivered to" the investors, and SGC did not "maintain[] possession or control of the CDs." J.A. 159-60. In short, "SGC is not, nor should it be, holding anything for . . . a customer." J.A. 160. "The fact that the security has gone down in value, even because of a fraud in which SGC is complicit," SIPC added, "does not change that result." J.A. 160. Because the CD investors failed to qualify as "customers" of SGC within the meaning of the Act, SIPC concluded, the investors were ineligible for liquidation protection.

Two years later, the SEC reached the opposite conclusion. In June 2011, the Commission issued a formal analysis stating that investors who had purchased SIBL CDs at the urging of SGC employees qualified as SGC "customers" under the Act. Citing evidence that Stanford had "structured the various

entities in his financial empire . . . for the principal, if not sole, purpose of carrying out a single fraudulent Ponzi scheme," the Commission determined that the "separate existence" of SIBL and SGC "should be disregarded." J.A. 242. The Commission also cited evidence that investors might have believed that they were depositing cash with SGC when they purchased their SIBL CDs, and that some SIBL CD deposits were diverted to pay SGC's expenses. "Based on the totality of the facts and circumstances," the SEC concluded, "investors with brokerage accounts at SGC who purchased SIBL CDs through SGC should be deemed to have deposited cash *with* SGC for purposes of SIPA coverage." J.A. 244. SIPC remained unpersuaded by the SEC's analysis, however, and declined to initiate a liquidation proceeding.

The SEC then filed an application with the district court under 15 U.S.C. § 78ggg(b), seeking an order compelling SIPC to commence liquidation proceedings for SGC. The court addressed several preliminary questions in a February 2012 decision. *See SEC v. Sec. Investor Prot. Corp.*, 842 F. Supp. 2d 321 (D.D.C. 2012). The court held that § 78ggg(b) required the court to evaluate de novo whether there were SGC "customers" in need of protection, rather than simply accepting the SEC's views without judicial review. *Id.* at 328-29. The court further held that § 78ggg(b) mandated a "summary proceeding," not the "full, formal procedures of the Federal Rules of Civil Procedure." *Id.* at 327. The court ordered supplemental briefing on the appropriate "procedures, burdens, and discovery" in the circumstances. *Id.* at 329.

In a second opinion, the district court denied the SEC's application on the merits. *See SEC v. Sec. Investor Prot. Corp.*, 872 F. Supp. 2d 1 (D.D.C. 2012). The court adopted SIPC's view that SIBL CD investors fail to qualify as SGC "customers" within the meaning of the statute because CD investors never

directly deposited funds or securities with SGC itself. *Id.* at 8. The court distinguished cases in which a broker had misappropriated funds without completing the promised securities purchase. Here, by contrast, the court reasoned, the "SIBL CDs were in fact purchased and did in fact exist for the SGC clients." *Id.* at 11. The court also adopted SIPC's view that a preponderance-of-the-evidence standard applies in § 78ggg(b) proceedings, *id.* at 5, but it concluded that the evidentiary standard ultimately did not matter because the case turned on "uncontested facts and an interpretation of law," *id.* at 12.

## II.

The SEC appeals the denial of its application under § 78ggg(b) to order SIPC to commence liquidation of SGC. That provision comes into play only if SIPC has failed to "act for the protection of [SGC] *customers*." 15 U.S.C. § 78ggg(b) (emphasis added); *see also* 15 U.S.C. § 78eee(a)(3)(A) (authorizing SIPC to file an application to liquidate only if it determines that the member broker "has failed or is in danger of failing to meet its obligations to *customers*" (emphasis added)). The central issue in this appeal is whether investors who purchased SIBL CDs at the suggestion of SGC employees qualify as SGC "customers" under the Act.

Because the district court rested its decision on uncontested facts and an interpretation of law, we review that decision de novo. *See In re New Times Sec. Servs., Inc.* (*New Times I*), 371 F.3d 68, 75 (2d Cir. 2004); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). We do not reach the question of the appropriate evidentiary burden, as we resolve the case based on the stipulated facts. We conclude, in agreement with the district court, that SIBL CD investors are not SGC "customers" within the meaning of the Act.

11

A.

The "principal purpose of SIPA is to protect investors against financial losses arising from the insolvency of their brokers." *In re New Times Sec. Servs., Inc.* (*New Times II*), 463 F.3d 125, 127 (2d Cir. 2006) (internal quotation marks omitted). Before SIPA, when a brokerage firm failed, customer funds and securities held on deposit with the brokerage often became depleted or enmeshed in bankruptcy proceedings. *See Barbour*, 421 U.S. at 415. The Act addresses that issue by protecting the *custody* function of brokers, i.e., by "protect[ing] customer interests in securities and cash left with broker-dealers." Louis Loss & Joel Seligman, Securities Regulation § 8.B.5.A, at 3290 (3d ed. 2003) (citing legislative history). SIPA thus aims "to protect securities investors against losses resulting from the failure of an insolvent or otherwise failed broker-dealer to properly perform its role as the custodian of customer cash and securities." 1 Collier on Bankruptcy ¶ 12.01, at 12-4 (16th ed. 2014).

The Act generally affords no protection against other types of losses, such as those stemming from a decline in investment value. That is so even if a broker fraudulently induced the losing investment in the first place. Consequently, "if a broker used fraudulent means to convince a customer to purchase a stock and the customer left that stock with the broker, who subsequently became insolvent, SIPC would be required by SIPA only to return the stock to the customer." *Sec. Investor Prot. Corp. v. Vigman*, 803 F.2d 1513, 1517 n.1 (9th Cir. 1986). In that fashion, the statute "'works to expose the customer to the same risks and rewards that would be enjoyed had there been no liquidation.'" *New Times II*, 463 F.3d at 128 (quoting 6 Collier on Bankruptcy ¶ 741.06[6] (15th ed. rev.)). Investors who suffer losses in investment value resulting from fraud may have claims under other provisions of the securities laws. *See*

*Vigman*, 803 F.2d at 1517 n.1. SIPA, however, is centrally addressed to a broker's custody function.

SIPA's definition of "customer" embodies the Act's focus on a broker's role as custodian of its customers' property. SIPA defines "customer" as

> any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

15 U.S.C. § 78*lll*(2)(A). The Act further provides that a "customer" includes "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2)(B)(i). The "'critical aspect of the "customer" definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 236 (2d Cir. 2011) (emphasis omitted) (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)); *see In re Brentwood Sec., Inc.*, 925 F.2d 325, 327 (9th Cir. 1991) ("[The 'customer'] definition embodies a common-sense concept: An investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent."). To come within the fold of SIPA's protections, an investor thus ordinarily must demonstrate both that the broker "actually . . . received, acquired or held the claimant's property, and that the transaction giving rise to the claim . . . contain[ed] the indicia of a fiduciary relationship" between the investor and the broker. 1 Collier on Bankruptcy ¶ 12.12[2], at 12-50. An investor's

"customer" status is evaluated on an asset-by-asset basis and may change over time. *See New Times II*, 463 F.3d at 130.

Here, insofar as the analysis focuses on the entity that in fact held custody over the property of the SIBL CD investors, the investors fail to qualify as "customers" of SGC under the statutory definition. That is because SGC never "received, acquired, or held" the investors' cash or securities. 15 U.S.C. § 78*lll*(2)(A); *see* 15 U.S.C. § 78*lll*(2)(B)(i). With regard to the investors' cash, it is undisputed that investors at no time deposited funds with SGC to purchase the SIBL CDs. The funds instead went to SIBL. Under the stipulated facts, investors either "wrote checks that were deposited into SIBL accounts and/or filled out or authorized wire transfer requests asking that money be wired to SIBL for the purpose of opening their accounts at SIBL and purchasing CDs." J.A. 952. With respect to the investors' securities, the SEC makes no contention that SGC held the CD certificates for investors. Rather, the stipulated facts provide that most "investors either received the physical CD certificates or had them held by an authorized designee." J.A. 953. And "[t]o the extent that some SIBL CD investors did not receive the physical certificates, the SEC is not relying on that fact to support its claims in this proceeding." *Id.* Because SGC had no custody over the investors' cash or securities, the investors do not qualify as SGC "customers" under the ordinary operation of the statutory definition.

B.

The Commission's principal response is that we should disregard the legal separateness of SGC and SIBL and treat them as a combined entity. According to the Commission, the companies operated in a highly interconnected fashion in furtherance of the fraudulent Ponzi scheme, eschewing corporate formalities. As a result, the Commission contends, investors

who deposited funds with SIBL for the purchase of CDs in effect deposited funds with SGC. In the Commission's view, the investors thus qualify as "customers" of a SIPC-member firm for purposes of triggering the Act's protections. We conclude, however, that even if SGC and SIBL were treated as a combined entity, investors still would not qualify as "customers" of a SIPC-member firm.

The Commission grounds its argument for disregarding the corporate separateness of SIBL and SGC in the doctrine of "substantive consolidation," an equitable doctrine typically applied in bankruptcy proceedings. "In general, substantive consolidation results in the combination of the assets of [two] debtors into a single pool from which the claims of creditors of both debtors are satisfied ratably." 2 Collier on Bankruptcy ¶ 105.09[3], at 105-110–11; *see In re Auto-Train Corp.*, 810 F.2d 270, 276 (D.C. Cir. 1987). Courts have employed a "variety" of tests when assessing whether to grant substantive consolidation. 2 Collier on Bankruptcy ¶ 105.09[2][a], at 105-96; *e.g., In re Owens Corning*, 419 F.3d 195, 210-11 (3d Cir. 2005). With regard to the Stanford companies, the court overseeing the receivership in connection with the SEC's civil enforcement action concluded that substantive consolidation was warranted.

The doctrine of substantive consolidation has been applied in SIPA liquidations. In *New Times I*, for instance, the bankruptcy court substantively consolidated a SIPC-member broker undergoing liquidation with a related, non-broker entity. 371 F.3d at 73. The assets of the related entity were brought into the SIPC member's liquidation estate, enlarging the available pool for customer recovery. *Id.* Investors with cash on deposit with the non-broker entity were treated as "customers" in the liquidation, even though the member broker itself never held those investors' funds. *Id.* Here, the SEC

contends, substantive consolidation of SIBL and SGC would similarly mean that investors who deposited funds with a non-SIPC member (SIBL) would be treated as "customers" of a SIPC member (SGC) for purposes of invoking the Act's protections.

Even if we were to consolidate, however, SIBL CD investors would not be "customers" of a SIPC-member entity under the statutory definition. The Act specifically excludes from "customer" status "any person, to the extent that . . . such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, *is part of the capital of the debtor*." 15 U.S.C. § 78*lll*(2)(C), (C)(ii) (emphasis added). We, like other courts, understand that provision to establish that "a claimant cannot qualify for customer status under SIPA to the extent that he or she is a lender rather than an investor." 1 Collier on Bankruptcy ¶ 12.12[4][a], at 12-56 (collecting cases). As the Eleventh Circuit has explained, "[c]ash that is simply lent to the brokerage cannot form the basis of a SIPA customer claim because the statute's definition of 'customer' excludes individuals whose claims are for 'cash . . . which . . . is part of the capital of the debtor.'" *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1304 n.18 (11th Cir. 2000) (ellipses in original) (quoting 15 U.S.C. § 78*lll*(2)(B) (2000), *now codified at* 15 U.S.C. § 78*lll*(2)(C)(ii) (2012)). In other words, "individuals must have a fiduciary relationship, rather than a creditor-debtor arrangement, with their brokerage to state a claim under SIPA." *Id*.; *accord In re Primeline Sec. Corp.*, 295 F.3d 1100, 1110 (10th Cir. 2002). The upshot is that a "person is excluded from eligibility for customer protection to the extent that person invests *in* the SIPA debtor by making a loan to the debtor, rather than investing *through* the SIPA debtor in the securities market as part of the debtor's ordinary course of business as a broker-dealer." 1 Collier on Bankruptcy ¶ 12.12[4][a], at 12-56–57 (emphasis added).

Here, investors who purchased SIBL CDs lent funds to SIBL that became part of SIBL's capital: Those investors gave cash to SIBL in exchange for a promise to be repaid with a fixed rate of return. *See Chadbourne*, 134 S. Ct. at 1064 (SIBL CDs "were debt assets that promised a fixed rate of return") (internal quotation marks omitted). The investors invested "in," not "through," SIBL. 1 Collier on Bankruptcy ¶ 12.12[4][a], at 12-56. The basic nature of those investors' relationship with the recipient of their cash would not change if the recipient were deemed to be a consolidated entity rather than SIBL alone. Under a consolidated view, investors who purchased SIBL CDs lent money to the consolidated SIBL/SGC entity, forming a "creditor-debtor arrangement." *Old Naples*, 223 F.3d at 1304 n.18. The CD proceeds thus became part of the consolidated entity's "capital," triggering the statutory exclusion from "customer" status for lenders. 15 U.S.C. § 78*lll*(2)(C)(ii).

The circumstances are directly analogous to those in *New Times II*. In that case, SIPC had liquidated a member brokerage firm, New Times Securities Services, Inc. (New Times), whose principal had defrauded investors. *See New Times II*, 463 F.3d at 126-27; *New Times I*, 371 F.3d at 71-72. A related, non-SIPC-member entity, New Age Financial Services, Inc. (New Age), was brought into the liquidation through substantive consolidation. *See New Times I*, 371 F.3d at 73. The issue in *New Times II* was whether individuals who had been defrauded into investing in "promissory notes" issued by New Times and New Age could recover as "customers" in the liquidation. *See New Times II*, 463 F.3d at 126-27. The Second Circuit held that they could not. *Id.* at 127-30. The court explained that the Act's "customer" definition "distinguishes between (i) claimants (protected as customers) who are engaged through brokers in trading activities in the securities markets and (ii) those (unprotected) claimants who are relying on the ability of a business enterprise to repay a loan." *Id.* at 128 (citing 15 U.S.C.

§ 78*lll*(2)(C)(ii)).  The New Times and New Age promissory notes were "just the type of debt instruments whose possession brings claimants within the category of unprotected lenders," even under a consolidated view. *Id.* at 129.  Here, the SIBL CDs likewise are "just the type of debt instruments whose possession brings claimants within the category of unprotected lenders." *Id.*  Section 78*lll*(2)(C)(ii) therefore excludes SIBL CD holders from "customer" status, even assuming SGC and SIBL should be substantively consolidated.

The SEC does not dispute that funds loaned to an entity generally become part of the entity's "capital" within the meaning of § 78*lll*(2)(C)(ii).  The SEC instead contends that the § 78*lll*(2)(C)(ii) exclusion is "inapplicable where, as here, the claimants did not intend to loan money to the broker-dealer." Pet'r's Br. 49-50 n.20.  According to the SEC, because investors intended to loan money to SIBL—not SGC—the CD proceeds could not become part of SGC's "capital" even if they became part of SIBL's.  But if SGC and SIBL are consolidated, investors *did* intend to loan money to the consolidated entity.  That intention puts this case in alignment with *New Times II*.

That intention also sets this case materially apart from the decisions on which the SEC relies, *Primeline*, 295 F.3d 1100, *Old Naples*, 223 F.3d 1296, and *In re C.J. Wright & Co. Inc.*, 162 B.R. 597 (Bankr. M.D. Fla. 1993).  In each of those cases, the investors had no intention to loan their funds to any affiliated entity that might be considered consolidated with the SIPC-member firm.  Instead, the individuals sought to invest cash to obtain debt instruments issued by an unrelated third party.  *See Primeline*, 295 F.3d at 1104, 1110; *Old Naples*, 223 F.3d at 1300-01, 1304-05; *C.J. Wright*, 162 B.R. at 606.  The investors sought to invest "through" the consolidated entity, not "in" the consolidated entity.  1 Collier on Bankruptcy ¶ 12.12[4][a], at 12-56.  The investors' funds therefore could not be considered

"part of the capital" of any consolidated entity for purposes of § 78*lll*(2)(C)(ii): The consolidated entity would hold the funds, in a strictly custodial capacity, for investment in a security issued by a third party. The opposite is true here: The consolidated entity—SIBL and SGC—held the funds in a *non*-custodial capacity, i.e., as part of its capital.

Indeed, the § 78*lll*(2)(C)(ii) exclusion specifically encompasses deposits that become "part of the capital" of a SIPC-member firm "by operation of law." It is undisputed that SIBL CD proceeds were "part of the capital" *of SIBL*. Under the SEC's view, those proceeds effectively also became part of SGC under the legal doctrine of substantive consolidation. But if so, the "capital" of SIBL would become "part of the capital" of SGC "by operation of law," placing the CD proceeds squarely within the ambit of § 78*lll*(2)(C)(ii). Because we believe the SEC's contrary understanding of the Act's definition of "customer" cannot be squared with the § 78*lll*(2)(C)(ii) exclusion, we need not address whether, as the SEC contends, its formal analysis letter should be accorded *Chevron* deference.

The SEC makes one additional argument in contending that the § 78*lll*(2)(C)(ii) exclusion should not apply here. The agency asserts—for the first time in its reply brief, and with no further elaboration—that "funds given to a consolidated entity in exchange for SIBL CDs should not become part of that entity's capital because the SIBL CDs were merely participatory interests in a Ponzi scheme." Pet'r's Reply Br. 16. The SEC made no such contention in its formal analysis letter, and we therefore need not consider whether the argument would amount to a reasonable construction of the statute for *Chevron* purposes. Considering the argument without any overlay of deference, we find it unpersuasive. The SEC offers no explanation why investment proceeds that would otherwise become part of the issuing entity's "capital" lose that characteristic if the

investment is induced by fraud as part of a Ponzi scheme. Nor are we aware of any legal support for that proposition. To the contrary, any such conclusion would be inconsistent with *New Times II*. There, the Second Circuit held that purchasers of promissory notes from a consolidated entity were "unprotected lenders" to the entity—rather than "customers" of the entity—even though the investment was "fraudulently induced." 463 F.3d at 129; *see id.* at 126 (investors were "issued fraudulent promissory notes"). There is no reason to reach a different conclusion here.

## C.

The SEC raises a fallback argument in the event we reject its effort to treat SGC and SIBL as one consolidated entity. According to the SEC, regardless of whether the companies are consolidated, investors who gave cash to SIBL for CDs should be deemed to have deposited cash with SGC under the approach set forth in *Old Naples* and *Primeline*. Those decisions, however, do not support concluding that the CD investors may be considered "customers" of SGC. The decisions instead reinforce our conclusion that the capital exclusion in § 78*lll*(2)(C)(ii) precludes finding the Act's "customer" definition satisfied here.

In *Old Naples*, the Eleventh Circuit considered another financial fraud involving both a SIPC-member broker and a non-SIPC-member entity. 223 F.3d at 1299-1300. Investors received instructions to send money to both entities with the understanding that the broker would then purchase bonds in the investors' names. *Id.* at 1301. Instead of buying the bonds, the owner of the entities misappropriated investor funds for his personal use and for payment of the brokerage firm's expenses. *Id.* at 1300. The Eleventh Circuit held that investors who had sent money to the non-SIPC-member entity could recover in the

liquidation as "customers" even though they had never deposited funds with the SIPC-member broker itself. *Id.* at 1302-06. The court found that customer status "does not . . . depend simply on to whom the claimant handed her cash or made her check payable." *Id.* at 1302. Instead, "[i]f an investor intended to have the brokerage purchase securities on her behalf and reasonably followed the broker's instructions regarding payment, she can be considered a 'customer' under SIPA if the brokerage or its agents then misappropriate the funds." *Id.* at 1303. Investors who had sent funds to the non-SIPC-member entity qualified as "customers" under the Act because they "had no reason to know that they were not dealing with" the SIPC-member broker and because the broker had "acquired control over all of" the deposited funds. *Id.* at 1303-04 (internal quotation marks omitted).

The Tenth Circuit's decision in *Primeline* is to the same effect. There, an employee of a SIPC-member firm operated a Ponzi scheme involving the sale to investors of "debentures in fictitious corporations." 295 F.3d at 1104 (internal quotation marks omitted). At the employee's direction, investors made out checks to third-party accounts—not to the brokerage firm itself—from which the employee misappropriated investor funds. *Id.* Citing *Old Naples*, the Tenth Circuit reiterated the principle that, "[i]f a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds." *Id.* at 1107. The court affirmed the bankruptcy court's finding that investors had "reasonably thought" that the employee was "acting as an agent of [the broker] when he directed them to make out their checks to one of his third-party companies." *Id.* (internal quotation marks omitted). As a result, the court held, those investors were entitled to recover as "customers" in the liquidation. *Id.* at 1109.

Here, the SEC points to facts that "could have led SGC account holders who purchased SIBL CDs through SGC to believe they were depositing cash with SGC for the purpose of purchasing the CDs," J.A. 243—even though, pursuant to the stipulated facts, those investors in fact sent their funds directly to SIBL. The SEC notes that certain SIBL CD investors "had accounts at SGC, dealt solely with SGC representatives, and paid for their CDs in accordance with SGC's instructions." Pet'r's Br. 52. The SEC highlights investor affidavits reporting that SGC employees blurred the lines between SGC and SIBL, "frequently refer[ring] simply to 'Stanford' without clearly distinguishing between" the two entities. J.A. 243. In addition, the SEC observes, certain customers "made checks for the purchase of the CDs payable to 'Stanford,'" possibly indicating "investor confusion regarding the entity with which they were depositing money." J.A. 244. Those considerations, in the SEC's view, bring this case within the fold of *Old Naples* and *Primeline* for investors who intended to deposit funds with SGC and reasonably believed they were doing so. As in those cases, the SEC contends, the fact that the CD investors in fact deposited cash with SIBL should not stand in the way of deeming them to have deposited cash with SGC for purposes of treating them as protected "customers." SIPC disagrees, contending, for example, that investors could not *reasonably* have believed they were depositing funds with SGC in light of CD disclosure statements clearly stating that the CDs were issued by a non-SIPC member.

We need not resolve that disagreement. Even if certain SIBL CD investors reasonably believed that they had deposited cash with SGC, *Old Naples* and *Primeline* still would fail to support concluding that those investors qualify as "customers" under the Act's definition. The SEC's argument disregards a subsequent inquiry undertaken in both *Old Naples* and *Primeline*: whether the investors intended to deposit their funds

as a loan so as to trigger the § 78*lll*(2)(C)(ii) exclusion for funds that become part of the recipient's "capital." In *Old Naples*, SIPC argued that the investors failed to qualify as "customers" because they intended to give a loan to the recipient rather than to deposit cash for investment on their behalf. *See* 223 F.3d at 1304. The court rejected that argument, holding that the investors intended the broker to use the funds to invest in bonds issued by a third party. *Id.* at 1304-05. In *Primeline*, similarly, SIPC argued that the investors "were lenders rather than investors" and thus fell outside the "customer" definition by virtue of the § 78*lll*(2)(C)(ii) exclusion. 295 F.3d at 1110. The court disagreed, affirming the bankruptcy court's finding that the investors "intended to invest, not loan, the funds each entrusted to [the broker]." *Id.*

This case stands on a markedly different footing. Here, as explained, the investors who purchased SIBL CDs acted as lenders. Even assuming those investors reasonably believed SIBL and SGC were part of a unified Stanford entity, they deposited their cash with that entity as lenders: in exchange for a promise of repayment in the form of a CD. Their funds thus became part of the Stanford entity's "capital" for purposes of the § 78*lll*(2)(C)(ii) exclusion. Accordingly, even if we adhere to the approach set forth in *Old Naples* and *Primeline*—as the SEC requests we do—that approach compels concluding that the investors in SIBL CDs fail to qualify as "customers" under the Act.

\* \* \* \* \*

In declining to grant the SEC's requested relief, the district court expressed that it was "truly sympathetic to the plight of the SGC clients who purchased the SIBL CDs and now find themselves searching desperately for relief." 872 F. Supp. 2d at 12. We fully agree. But we also agree with the district court's

conclusion that SIBL CD investors were not SGC "customers" under the Act.  We therefore affirm the district court's denial of the SEC's application for an order compelling SIPC to commence liquidation of SGC.

*So ordered.*